Garrett Wotkyns, AZ Bar No. 025887
**SCHNEIDER WALLACE COTTRELL**
**KONECKY WOTKYNS LLP**
8501 North Scottsdale Road, Suite 270
Scottsdale, Arizona  85253
(480) 428-0142 Telephone
(866) 505-8036 Facsimile
gwotkyns@schneiderwallace.com

David R. Deary*
W. Ralph Canada, Jr.*
Jim L. Flegle*
Wilson E. Wray*
John McKenzie*
Donna Lee*
Tyler M. Simpson*
**LOEWINSOHN FLEGLE**
**DEARY SIMON LLP**
12377 Merit Drive, Suite 900
Dallas, Texas 75251
(214) 572-1700 Telephone
(214) 572-1717 Facsimile

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Benyamin Avrahami; Orna Avrahami; Feedback Insurance Company, LTD; BYS Company, ACC; Chandler One, LLC; Junction Development, LLC; O & E Corporation; White Mountain Equities, L.L.C.; and White Knight Investment, A.C.C., on behalf of themselves and all others similarly situated;<br><br>     *Plaintiffs*,<br><br>vs.<br><br>Celia Clark; Clark & Gentry, P.L.L.C.; John Garcia, In His Capacity as Personal | CASE NO. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**JURY DEMAND** |

1   Representative for the Estate Of Craig   )
2   McEntee; McEntee & Associates P.C.;   )
    Neil Hiller; Fennemore Craig, P.C.; Alan   )
3   Rosenbach; ACR Solutions Group; RMS   )
    Solutions, Inc.; Heritor Management,   )
4   LTD; and Pan American Reinsurance   )
    Company, LTD.;   )
5   )
6          *Defendants.*

**CLASS ACTION COMPLAINT**

Defendants mass-produced a flawed insurance product that exacerbated their clients' tax burdens when this product legally could have, and should have, alleviated Plaintiffs' tax burdens while also providing insurance benefits. Properly implemented, captive insurance can confer legitimate tax and insurance advantages. But Defendants did not properly implement the Captive Insurance Strategies for Plaintiffs and the Class here. Instead, using a prepackaged collection of misrepresentations, omissions, and form documents common across the Class, Defendants churned out a faulty captive insurance product. As designed and implemented by Defendants, this product could not deliver the insurance and tax advantages Defendants promised. Defendants knew their insurance products could not and were not delivering the advantages Defendants promised. And yet Defendants continued to market their flawed captive insurance products.

Bringing together a collection of entities and individuals to use the mail and/or wires to develop, promote, sell, and implement captive insurance products known to be faulty amounts to running a racketeering enterprise. This racketeering enterprise injured Plaintiffs by causing them to incur back taxes, interest, and/or penalties for claiming business insurance expense deductions while also avoiding income recognition under Section 831(b) of the Tax Code. There were only minor, if any, variations in the misrepresentations by the Defendants about applicable tax law and insurance standards to the members of the Class. And while there are numerous Defendants participating in this unlawful enterprise, the invalidity of the Captive Insurance Strategies under these tax provisions and the misrepresentations by Defendants predominate.

Plaintiffs Benyamin Avrahami, Orna Avrahami, Feedback Insurance Company, Ltd. ("Feedback"),   BYS Company, ACC ("BYS"), Chandler One, LLC ("Chandler One"), Junction Development, LLC ("Junction Development"), O & E Corporation ("O & E"), White Mountain Equities, L.L.C. ("White Mountain"), White Knight Investment, A.C.C. ("White Knight" and, together with the Avrahamis, Feedback, BYS, Chandler One, Junction Development, O & E, and White Mountain, "Plaintiffs"), file this Class Action Complaint to assert claims, on behalf of themselves and all others similarly situated, against Defendants Celia Clark ("Clark"), Clark & Gentry, P.L.L.C ("Clark & Gentry"), Neil Hiller ("Hiller"), Fennemore Craig, P.C. ("Fennemore"), Alan Rosenbach ("Rosenbach"),  ACR Solutions Group ("ACR"), RMS Solutions, Inc. ("RMS"), Heritor Management, Ltd. ("Heritor"), and Pan American Reinsurance Company, Ltd. ("Pan American").  Plaintiffs also assert non-class action claims against John Garcia, in his capacity as personal representative of the estate of Craig McEntee ("McEntee"), and McEntee & Associates P.C. ("McEntee & Associates").  Clark, Clark & Gentry, Hiller, Fennemore, Rosenbach, ACR, RMS, Heritor, Pan American, McEntee, and McEntee & Associates, are collectively referred to as "Defendants."

## I.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because the Class Action Fairness Act of 2005 confers diversity jurisdiction upon this Court, as members of the proposed Class are citizens of states that are different from Defendants' state(s) of citizenship, and the aggregate amount in controversy exceeds $5,000,000. In addition, this Court has jurisdiction over Plaintiffs' claims based on 28

U.S.C. § 1331 and/or 28 U.S.C. § 1337, which provide jurisdiction for Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §1961 *et seq.*; and 29 U.S.C. § 1367, which provides jurisdiction for supplemental state claims, including common-law fraud and conspiracy claims.

2.    Personal jurisdiction comports with due process under the United States Constitution, the long-arm statutes of Arizona, and the provisions of 18 U.S.C. § 1965(b) and (d).

3.    Without limiting the generality of the foregoing, each Defendant (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority) has:

a.   transacted business in Arizona;

b.   contracted to supply or obtain services in Arizona;

c.   availed themselves intentionally of the benefits of doing business in Arizona;

d.   produced, promoted, sold marketed, and/or distributed their products or services in Arizona and, thereby, have purposefully profited from their access to markets in Arizona;

e.   caused tortious damage by act or omission in Arizona;

f.   caused tortious damage in Arizona by acts or omissions committed outside such jurisdiction while (i) regularly doing business or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

g.   committed acts and omissions which Defendants knew or should have known would cause damage (and, in fact, did cause damage) in Arizona to Plaintiffs and members of the Class while (i) regularly doing or soliciting business in such jurisdiction, and/or (ii) engaging

in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

h. engaged in a conspiracy with others doing business in Arizona that caused tortious damage in Arizona; and/or

i. otherwise had the requisite minimum contacts with Arizona such that, under the circumstances, it is fair and reasonable to require Defendants to come to Court to defend this action.

4. Venue is proper under 28 U.S.C. § 1391, because, *inter alia*, a substantial part of the events or acts giving rise to the causes of action alleged in this complaint arose in, among other places, the District of Arizona, and the harmful effects of Defendants' fraud and wrongful conspiracy were felt in, among other places, the District of Arizona. In addition, venue is proper under 18 U.S.C. § 1965 because Plaintiffs Benyamin Avrahami and Orna Avrahami and Defendants McEntee, McEntee & Associates, Hiller, and Fennemore reside in this District.

## II.

## <u>PARTIES</u>

5. Plaintiff Benyamin Avrahami is an individual and a citizen of Arizona. Mr. Avrahami resides in Paradise Valley, Arizona.

6. Plaintiff Orna Avrahami is an individual and a citizen of Arizona. Mrs. Avrahami resides in Paradise Valley, Arizona.

7. Plaintiff Feedback Insurance Company, Ltd. is a company organized and existing under the laws of St. Kitts with its principal place of business at 8500 N. Pisado Bueno, Paradise Valley, AZ 85253.

4

8.      Plaintiff BYS Company, AAC is a company organized and existing under the laws of Arizona with its principal place of business at 10441 N. Scottsdale Road, Scottsdale, AZ 85253.

9.      Plaintiff Chandler One, LLC is a limited liability company organized and existing under the laws of Arizona with its principal place of business at 10441 N. Scottsdale Road, Scottsdale, AZ 85253.

10.     Plaintiff Junction Development, LLC is a limited liability company organized and existing under the laws of Arizona with its principal place of business at 10441 N. Scottsdale Road, Scottsdale, AZ 85253.

11.     Plaintiff O & E Corporation is a corporation organized and existing under the laws of Arizona with its principal place of business at 10441 N. Scottsdale Road, Scottsdale, AZ 85253.

12.     Plaintiff White Mountain Equities, LLC is a limited liability company organized and existing under the laws of Arizona whose members are residents of Arizona with its principal place of business at 10441 N. Scottsdale Road, Scottsdale, AZ 85253.

13.     Plaintiff White Knight Investment, AAC is a company organized and existing under the laws Arizona whose members are residents of Arizona with its principal place of business at 10441 N. Scottsdale Road, Scottsdale, AZ 85253.

14.     Defendant Celia Clark is an individual and, on information and belief, a citizen of New York.  Upon information and belief, Clark resides at 240 E. 47th Street, Apt. 28E, New York, NY 10017.  Ms. Clark is or was during the relevant period an

employee of Clark & Gentry. This Court has personal jurisdiction over Ms. Clark pursuant to the Constitution and laws of the United States and the State of Arizona. At all relevant times, Ms. Clark has done and is doing business in the State of Arizona, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action. As described hereafter, Ms. Clark has contracted with an Arizona resident, and either party was to perform the contract in whole or in part in the State of Arizona. Additionally, Ms. Clark has committed torts, in whole or in part, in the State of Arizona, including intentional tortious acts directed at a resident of the State of Arizona, where the brunt of the harm was felt. Ms. Clark has purposefully availed herself of the benefits and protections of the laws of the State of Arizona and could reasonably anticipate being subject to the jurisdiction of courts of the State of Arizona. This suit against Ms. Clark will not offend traditional notions of fair play and substantial justice and is consistent with due process of law. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

15. Defendant Clark & Gentry, P.L.L.C is a professional limited liability company organized and existing under the laws of New York and whose members are residents of New York with its principal place of business at 570 Lexington Avenue, Suite 1910, New York, NY 10022. This Court has personal jurisdiction over Clark & Gentry pursuant to the Constitution and laws of the United States and the State of Arizona. At all relevant times, Clark & Gentry has done and is doing business in the State of Arizona, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action. As described hereafter, Clark

& Gentry has contracted with an Arizona resident, and either party was to perform the contract in whole or in part in the State of Arizona.  Additionally, Clark & Gentry has committed torts, in whole or in part, in the State of Arizona, including intentional tortious acts directed at a resident of the State of Arizona, where the brunt of the harm was felt.  Clark & Gentry's conduct in the State of Arizona has been committed by officers, directors, employees, and/or agents of Clark & Gentry acting within the scope of their employment or agency.  Clark & Gentry has purposefully availed itself of the benefits and protections of the laws of the State of Arizona and could reasonably anticipate being subject to the jurisdiction of courts of the State of Arizona.  This suit against Clark & Gentry will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

16.     Defendant John Garcia is an individual and, on information and belief, a citizen of Arizona.  Mr. Garcia resides at 241 South Main St., Yuma, AZ 85364.  Mr. Garcia is the personal representative of the estate of Craig McEntee.  In addition, venue and jurisdiction as to this defendant are proper in this District under 18 U.S.C. §1965.  Plaintiffs name Mr. Garcia as a Defendant to seek relief on their own behalf and not on behalf of the Class.

17.     Defendant McEntee & Associates P.C. is a professional corporation organized and existing under the laws of Arizona with its principal place of business at 2231 E. Camelback Road #320, Phoenix, AZ  85016.  Plaintiffs name McEntee &

Associates as a Defendant to seek relief on their own behalf and not on behalf of the Class.

18.    Defendant Neil Hiller is an individual who, on information and belief, resides and works in Phoenix, AZ. Mr. Hiller is or was during the relevant period an employee of Fennemore.  On information and belief, Hiller resides at 5342 N. 37th Place, Paradise Valley, AZ 85253.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

19.    Defendant Fennemore Craig, P.C. is a professional corporation organized and existing under the laws of Arizona, with offices at 2394 E. Camelback Rd, Suite 600, Phoenix, AZ 85016.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

20.    Defendant Alan Rosenbach is an individual and, on information and belief, a citizen of Hallandale, Florida.  Upon information and belief, Rosenbach resides at 1800 S. Ocean Drive, Suite 804, Hallandale, Florida.  Mr. Rosenbach is or was during the relevant period an employee of ACR.  This Court has personal jurisdiction over Mr. Rosenbach pursuant to the Constitution and laws of the United States and the State of Arizona.   At all relevant times, Mr. Rosenbach has done and is doing business in the State of Arizona, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action.  As described hereafter, Mr. Rosenbach has contracted with an Arizona resident, and either party was to perform the contract in whole or in part in the State of Arizona.  Additionally, Mr. Rosenbach has committed torts, in whole or in part, in the State of Arizona, including intentional tortious

acts directed at a resident of the State of Arizona, where the brunt of the harm was felt. Mr. Rosenbach has purposefully availed himself of the benefits and protections of the laws of the State of Arizona and could reasonably anticipate being subject to the jurisdiction of courts of the State of Arizona. This suit against Mr. Rosenbach will not offend traditional notions of fair play and substantial justice and is consistent with due process of law. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

21.     Defendant ACR Solutions Group is a corporation organized and existing under the laws of Florida with its principal place of business at 1800 S. Ocean Drive, Suite 804, Hallandale, FL 33009. This Court has personal jurisdiction over ACR pursuant to the Constitution and laws of the United States and the State of Arizona. At all relevant times, ACR has done and is doing business in the State of Arizona, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action. As described hereafter, ACR has contracted with an Arizona resident, and either party was to perform the contract in whole or in part in the State of Arizona. Additionally, ACR has committed torts, in whole or in part, in the State of Arizona, including intentional tortious acts directed at a resident of the State of Arizona, where the brunt of the harm was felt. ACR's conduct in the State of Arizona has been committed by officers, directors, employees, and/or agents of ACR acting within the scope of their employment or agency. ACR has purposefully availed itself of the benefits and protections of the laws of the State of Arizona and could reasonably anticipate being subject to the jurisdiction of courts of the State of Arizona. This suit

against ACR will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.   In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

22.   Defendant RMS Solutions, Inc. is a corporation organized and existing under the laws of Illinois with its principal place of business at 736 N. Western Avenue, Suite 233, Lake Forest, Illinois 60045.  This Court has personal jurisdiction over RMS pursuant to the Constitution and laws of the United States and the State of Arizona.   At all relevant times, RMS has done and is doing business in the State of Arizona, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action.  As described hereafter, RMS has contracted with an Arizona resident, and either party was to perform the contract in whole or in part in the State of Arizona.  Additionally, RMS has committed torts, in whole or in part, in the State of Arizona, including intentional tortious acts directed at a resident of the State of Arizona, where the brunt of the harm was felt.  RMS's conduct in the State of Arizona has been committed by officers, directors, employees, and/or agents of RMS acting within the scope of their employment or agency.  RMS has purposefully availed itself of the benefits and protections of the laws of the State of Arizona and could reasonably anticipate being subject to the jurisdiction of courts of the State of Arizona.  This suit against RMS will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.   In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

23.     Defendant Heritor Management, Ltd. is a corporation organized and existing under the laws of St. Kitt's and Nevis with its principal place of business at Henville Building, Main Street, Suite 1, Charlestown, Nevis, West Indies.  This Court has personal jurisdiction over Heritor pursuant to the Constitution and laws of the United States and the State of Arizona.   At all relevant times, Heritor has done and is doing business in the State of Arizona, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action.  As described hereafter, Heritor has contracted with an Arizona resident, and either party was to perform the contract in whole or in part in the State of Arizona.  Additionally, Heritor has committed torts, in whole or in part, in the State of Arizona, including intentional tortious acts directed at a resident of the State of Arizona, where the brunt of the harm was felt.  Heritor's conduct in the State of Arizona has been committed by officers, directors, employees, and/or agents of Heritor acting within the scope of their employment or agency.  Heritor has purposefully availed itself of the benefits and protections of the laws of the State of Arizona and could reasonably anticipate being subject to the jurisdiction of courts of the State of Arizona.  This suit against Heritor will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

24.     Defendant Pan American Reinsurance Company, Ltd. is a corporation organized and existing under the laws of St. Kitt's and Nevis with its principal place of business at Henville Building, Main Street, Suite 1, Charlestown, Nevis, West Indies.

This Court has personal jurisdiction over Pan American pursuant to the Constitution and laws of the United States and the State of Arizona.   At all relevant times, Pan American has done and is doing business in the State of Arizona, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action.   As described hereafter, Pan American has contracted with an Arizona resident, and either party was to perform the contract in whole or in part in the State of Arizona.   Additionally, Pan American has committed torts, in whole or in part, in the State of Arizona, including intentional tortious acts directed at a resident of the State of Arizona, where the brunt of the harm was felt.   Pan American's conduct in the State of Arizona has been committed by officers, directors, employees, and/or agents of Pan American acting within the scope of their employment or agency.   Pan American has purposefully availed itself of the benefits and protections of the laws of the State of Arizona and could reasonably anticipate being subject to the jurisdiction of courts of the State of Arizona.   This suit against Pan American will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.   In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

## III.

## NATURE OF THE CLAIMS

**A.     THE CAPTIVE INSURANCE STRATEGIES**

25.     Plaintiffs, on their own behalf and on behalf of the Class, as herein defined, bring this action against Defendants seeking the recovery of damages that Plaintiffs and the Class sustained in connection with their participation in Captive Insurance Strategies

that Defendants designed, developed, promoted, sold, implemented, and managed. Plaintiffs, on their own behalf and on behalf of the Class, bring claims for breach of fiduciary duty, negligence, negligent misrepresentation, disgorgement, rescission, fraud, violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§1961–1968, violations of Arizona's RICO statute, A.R.S. §13-2301, *et seq*., breach of contract/duty of good faith and fair dealing, civil conspiracy, and aiding and abetting breaches of fiduciary duty and fraud.  Plaintiffs and the Class seek compensatory damages against Defendants for damages arising from Captive Insurance Strategies that Plaintiffs and the Class entered into and utilized on their federal and state tax returns on the promotions and advice of Defendants from 2005 onwards ("Captive Insurance Strategies").  Unbeknownst to Plaintiffs and the Class, the Defendants and the Other Participants[1] jointly and in concert developed, promoted, sold, implemented, and managed the Captive Insurance Strategies.

26.     The Captive Insurance Strategies are set forth in detail below.  The Defendants and the Other Participants, acting pursuant to an elaborate and carefully devised common scheme and unlawful conspiracy, counseled and advised Plaintiffs and the Class to undertake the Captive Insurance Strategies, claiming the Captive Insurance Strategies would provide non-tax benefits including, but not limited to, lawful insurance coverage, and in addition would legally reduce Plaintiffs' and the Class's federal and state taxes.  At the time Defendants marketed and sold the Captive Insurance Strategies to

---

[1] The "Other Participants" include individuals and entities such as actuaries, underwriters, attorneys, accountants, brokers, and others not named as Defendants herein who assisted Defendants in designing, promoting, selling, implementing, and managing the Captive Insurance Strategies.

Plaintiffs and the Class, Defendants knew or should have known that the Captive Insurance Strategies did not provide insurance recognized under the Internal Revenue Code ("IRC" or "Code") and would not and could not yield the tax treatment Defendants represented.  Importantly, Defendants' primary motive in their pre-planned scheme was to exact significant fees and commissions from Plaintiffs and the Class.  The Internal Revenue Service ("IRS") ultimately determined that Plaintiffs and the Class owed substantial back taxes, interest, and penalties as a result of their participation in the Captive Insurance Strategies.

27.  It was not reasonable to expect that Plaintiffs and the Class were knowledgeable and they were not, in fact, knowledgeable about complex insurance and tax matters, including tax law and captive insurance.  Plaintiffs and the Class detrimentally relied on Defendants as their trusted insurance, tax, legal, actuarial, and underwriting advisors for comprehensive insurance, tax, legal, actuarial, and underwriting advice, and upon Defendants' repeated unequivocal representations that the Captive Insurance Strategies were completely legal tax-advantaged insurance strategies within the meaning of Code § 831(b), which created actual insurance—not self-insurance, as defined under the Code—and had the requisite business purpose and economic purpose to be fully deductible for tax purposes as insurance expense and not illegal tax shelters.

28.  Unbeknownst to Plaintiffs and the Class, Defendants entered into undisclosed, illegal business arrangements with each other and the Other Participants.  Through these arrangements, Defendants systematically identified potential or existing

14

clients who had substantial income in a particular tax year.  The Defendants unlawfully abused their positions of trust, confidence, and prestige with their clients, including Plaintiffs and the Class—in accordance with the Defendants' pre-planned and fraudulent scheme—by fraudulently inducing those clients into transactions with Defendants for legal, accounting, tax, insurance, and actuarial advice and services in connection with the Captive Insurance Strategies.

29.     Each of the Defendants and Other Participants knew or should have known that these purported tax-advantaged Captive Insurance Strategies were, in reality, nothing more than illegal and abusive tax shelters.  To profit from their scheme, the Defendants and Other Participants intentionally concealed the true nature of the strategies from tax authorities and from Plaintiffs and the Class.

30.     The Defendants and Other Participants knew or should have known that the IRS would disallow the Captive Insurance Strategies, due to *inter alia* the lack of business purpose and economic substance to the transactions in the way they designed, implemented, and managed them; the improper circular flow of funds, including the use of funds being cycled as loans or distributions back to Plaintiffs and the Class; the lack of proper risk shifting and risk distributions; and most importantly, the organizational scheme that was designed by the Defendants primarily to allow them to charge and collect, in multiple ways, fees and expenses across the entire structure, without any real intent to fund the captive insurance companies for real risk management and in a structure that supported actual insurance and re-insurance purposes.  Despite these issues,

Defendants and Other Participants continued to promote and sell the Captive Insurance Strategies and advise Plaintiffs and the Class they were lawful.

31.     Defendants prepared federal tax returns in connection with the Captive Insurance Strategies, and the Defendants and Other Participants advised Plaintiffs and the Class to sign and file individual federal tax returns using and reporting the deductions generated by the Captive Insurance Strategies.  Even after the Defendants and Other Participants learned that the IRS had begun to audit and disallow deductions claimed through similar tax strategies, the Defendants and other Participants continued to advise, promote, and encourage Plaintiffs and the Class to use the Captive Insurance Strategies to offset income and/or capital gains on their income tax returns.

32.     After Defendants had convinced their clients to pursue the tax-advantaged Captive Insurance Strategies, Defendants jointly worked with each client to execute the technical portion of the Captive Insurance Strategies and then operated and managed all aspects of the Plaintiffs and Class members' Captive Insurance Strategies.  At no point in time did the Defendants or the Other Participants ever disclose to Plaintiffs and the Class that they had conspired to fraudulently, recklessly, or negligently, design, promote, sell, implement, and manage the Captive Insurance Strategies, and were in no way independent from each other. These facts only recently were discovered by Plaintiffs and include the presence in the transactions of so many affiliated and related parties with no arm's-length supporting business purpose to manage, shift, insure and minimize risk factors in any actual insurance business.

33.     Unbeknownst to Plaintiffs and the Class, the Defendants and Other Participants conspired to design, promote, sell, implement, and manage the Captive Insurance Strategies for the purpose of receiving and splitting substantial fees.  The receipt of those fees was the primary, if not sole, motive of Defendants in the development and execution of the Captive Insurance Strategies.  Unbeknownst to Plaintiffs and the Class, the Defendants designed the Captive Insurance Strategies and conspired to provide a veneer of legitimacy to one another's opinions of the lawfulness and tax consequences of the Captive Insurance Strategies by agreeing to the representations and advice that would be made to Plaintiffs and the Class.

34.     Clark and Clark & Gentry advised their clients, including Plaintiffs, that their tax professionals had designed proprietary tax-advantaged insurance plans that would provide non-tax benefits including, but not limited to, lawful insurance coverage, and in addition would legally reduce Plaintiffs' federal and state taxes.  Further, they structured the arrangements so that Plaintiffs could "borrow back" any excess funds used in the insurance arrangements—such borrowing of excess premium being impermissible under the laws Defendants cited to support their action, although they represented otherwise to Plaintiffs.  In reality, insurance companies do not provide opportunities and benefits for the insured to access any excess funds without the borrowed funds being loaned at market rates and also being secured by actual cash value or other collateral that can support repayment of the loan enforced.  Defendants knew or should have known that these "Captive Insurance Strategies" were, in reality, nothing more than illegal and abusive tax shelters.  To profit from their scheme, Defendants counted on their ability to

conceal the true nature of the Captive Insurance Strategies from tax authorities and Plaintiffs.

35.     Despite Defendants' knowledge that the Captive Insurance Strategies were illegal and abusive tax shelters, Clark, Clark & Gentry, McEntee, and McEntee & Associates as well as other Defendants and Other Participants assisted Plaintiffs with the preparation of certain of their federal and state tax returns using the represented tax deductions generated by the Captive Insurance Strategies.  McEntee and McEntee & Associates then signed the tax returns and advised Plaintiffs to sign and file the tax returns.

36.     The Defendants and Other Participants aggressively implemented their fraudulent scheme.  The Defendants and the Other Participants solicited their own clients to enter into the Captive Insurance Strategies.  The Defendants and the Other Participants identified successful individuals—such as Plaintiffs—as potential clients based on their knowledge of their finances, and identified other professionals who might serve as a source of potential clients.

37.     The receipt of fees and pecuniary gain from those fees was the primary motive for the Defendants and Other Participants' conduct; the provision of professional services to clients was merely an incidental byproduct of, not a motivating factor for, the Defendants and Other Participants' conduct alleged herein.  Further, the Defendants and Other Participants' arrangement gave each of the participating Defendants and Other Participants a significant pecuniary interest in the advice and professional services they would render, including promoting and implementing a captive insurance arrangement

that provided Plaintiffs, via the "loans," with readily available cash "at will" to pay for all those professional services, but failed to satisfy the economic substance, business purpose and step transaction doctrines. The form and economic substance of the arrangement was to drive clients to get a tax deduction for an expense that could not be properly justified and subsequently avoid taxes with unsecured "borrow back" provisions and cycling back premiums to affiliated parties for purported expenses.

38. The Defendants and Other Participants had a financial, business, and property interest in inducing Plaintiffs, as well as other clients, to enter into Captive Insurance Strategies, and to do so, promised, opined, and assured Plaintiffs that the Captive Insurance Strategies would legally reduce Plaintiffs' taxes.

39. At all times alleged herein, Defendants knew that Plaintiffs placed tremendous trust and faith in Defendants as Plaintiffs' legal, accounting, tax, financial, and actuarial advisors with respect to all aspects of the Captive Insurance Strategies.

40. Based on Defendants' advice and recommendations, Plaintiffs paid a significant amount of fees to Defendants and the Other Participants to implement the Captive Insurance Strategies. Ultimately, as a direct result of Defendants' fraudulent advice and unlawful conduct, the IRS disallowed Plaintiffs' Captive Insurance Strategies and assessed Plaintiffs with substantial back-taxes, interest, and penalties.

**B.    THE TAX TREATMENT OF PROPERLY IMPLEMENTED CAPTIVE INSURANCE STRATEGIES**

41. Premiums paid for insurance are deductible as ordinary and necessary business expenses under section 162(a) of the Code. Sec. 1.162-1(a), Income Tax Regs. But amounts set aside in a loss reserve as self-insurance are not. The question of whether

19

amounts paid are deductible as insurance expenses therefore turns on whether the payments qualify as insurance or self-insurance. The Tax Code does not define "insurance," but the Supreme Court has stated that insurance is a transaction that involves "an actual 'insurance risk'" and that "[h]istorically and commonly insurance involves risk-shifting and risk-distributing." *Helvering v. Le Gierse*, 312 U.S. 531, 539 (1941). To determine whether an arrangement qualifies as insurance, the arrangement must:

      a.  involve risk-shifting;

      b.  involve risk-distribution;

      c.  involve insurance risk; and

      d.  meet commonly accepted notions of insurance.

42. While insurance premiums paid are tax deductible, insurance premiums received by insurance companies are taxed under the Code. Insurance companies—other than life insurance companies—are generally taxed on their income in the same manner as other corporations. Section 831(b), however, provides an alternative taxing structure for certain small insurance companies. Under that Section, if a nonlife insurance company had gross receipts less than or equal to $600,000 and met certain premium percentage requirements, then it was exempt from tax. Otherwise, if a nonlife insurance company had net written premiums (or, if greater, direct written premiums) that did not, during the time period relevant to this action, exceed $1.2 million[2] then it could elect to be taxed under section 831(b) and be subject to tax only on its taxable investment income.

---

[2] After the time period discussed herein, the maximum was increased from $1.2 million to $2.4 million.

43.     Captive insurance involves a situation where the insureds and the insurer are related.  A pure captive insurance company only insures the risks of companies related to it by ownership.  The practice dates back to at least the 1950s when Youngstown Sheet and Tube set up its own insurance company to insure its coke and iron mines.  The concept spread and the IRS started challenging whether the payments between a company and its captive were deductible insurance expenses or instead nondeductible self-insurance.[3]   To qualify as deductible insurance expenses, despite the fact that the insured and insurer are related, the insurance must comply with and adhere to the laws and requirements of how such insurance is properly underwritten and backed by adequate reserves for the nature of the risk.  Further, there must be an understanding of and compliance with all applicable tax and regulatory requirements.[4]  Defendants have duties to disclose and explain to Plaintiffs each and every one of these requirements.

44.     A microcaptive insurance company is a company whose premiums remain below the Section 831 threshold and is related to its insureds by ownership.  Two advantages accrue to the microcaptive and its insureds if the microcaptive insurance company meets the Section 831 criteria and engages in *bona fide* insurance arrangements.  First, for the insureds, the income paid to the microcaptive is deductible for tax purposes.  Second, for the microcaptive and its owners, the premiums received by the microcaptive are not taxable as income.  The shared ownership between the microcaptive and its

---

[3] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

[4] In particular, the "economic substance" and "step transaction" doctrines permeate all aspects of the captive structure, including (i) related party loans, and (ii) the need of transactions to be supported by real risk and business purpose. A captive cannot merely serve as a vehicle to provide a business expense in pursuit of a lucrative tax deduction

21

insureds means the owners can deduct the premium expense that the insureds paid to the microcaptive while paying no taxes on premiums received by the microcaptive.

45.    Once a microcaptive insurance company is formed, it must price its insurance policies.  Underwriting is the process by which insurers determine the price, terms and conditions, and acceptability of a risk.  To perform this task, underwriters usually rely on actuaries.  Actuaries define the rating scheme and the underwriters make the individual selections and adjustments for the given risks.  An actuary typically starts with published rates and large datasets for particular risks and makes adjustments for policy limits, estimates of the frequency and severity of loss, deductibles, the claims history of a particular customer, and perhaps a dozen or so other factors that can be combined into equations that are used by the actuary to set a premium for a particular policy.  Actuaries are also supposed to ensure their work is appropriate for its intended use, consider whether their work includes large enough risk classes "to allow credible statistical inferences regarding expected outcomes," and check the reasonableness of their results.  *See* Actuarial Standard of Practice No. 12:  Risk Classification (for All Practice Areas), sec. 3.3 (Actuarial Standards Bd. 2005).[5]  Insurance pricing involves some subjectivity, but the work of an actuary must be reproducible and explainable to other actuaries.  *See* Actuarial Standard of Practice No. 41:  Actuarial Communications, sec. 3.2 (Actuarial Standards Bd. 2010).

---

[5] "The Actuarial Standards Board (ASB) is vested by the professional actuarial societies with the responsibility for promulgating Actuarial Standards of Practice (ASOPs) for actuaries providing professional services in the United States.  Actuaries are required to follow the ASOPs by their actuarial societies."  Acuity, A Mut. Ins. Co., & Subs. v. Commissioner, T.C. Memo. 2013-209, at *13.

## C.   THE PLAINTIFFS' CAPTIVE INSURANCE STRATEGIES

### 1.  The Avrahamis are Introduced to the Captive Insurance Strategy

46.     Benyamin Avrahami was raised in Israel where his family fled to avoid religious persecution in Iran. He immigrated to the United States in 1974, went to college, and obtained degrees in business administration and gemology, as well as a real-estate license. He met and married Orna, who had moved to the United States in 1980.

47.     In 1980, Mr. Avrahami went into business with his brother, and they created American Findings Corporation ("American Findings"). American Findings started out as a supplier of findings—the components that go into finished pieces of jewelry; a few years later, however, American Findings bought a financially troubled jewelry store named London Gold and got out of the wholesale findings business.  The Avrahamis turned London Gold around, and now American Findings (doing business as London Gold) operates, and operated during the years at issue in this Complaint, three successful retail jewelry stores in the Phoenix metropolitan area.

48.     In addition, the Avrahamis own several commercial real-estate companies. These include:

> a.  BYS, which owns and operates a retail shopping center in Tempe;
>
> b.  Chandler One, which owns a commercial building in Chandler, and leases the space to three tenants—one of the jewelry stores owned by American Findings and two unrelated retail companies;
>
> c.  Junction Development, which is in Scottsdale, and leases space to another of the jewelry stores owned by American Findings;
>
> d.  O & E , which owns a shopping center in Phoenix, Arizona;

e.   White Mountain, which owns land in Show Low, Arizona; and

f.   White Knight, which owns a large commercial strip mall in Tempe, and leases the space to several tenants.

In 2006, American Findings, Chandler One, O & E, and White Knight collectively deducted about $150,000 in insurance expenses.

49.   By 2007, American Findings, Chandler One, O & E, and White Knight were thriving and the Avrahamis turned to Craig McEntee and McEntee and Associates, who had been their trusted CPAs for about 25 years, for advice.  McEntee and Associates was a full-service accounting firm employing six full-time employees, primarily dealing with tax issues and the preparation of tax returns. McEntee and Associates also provided bookkeeping services. McEntee recommended that the Avrahamis consult with Hiller for expertise in tax law and Clark for her expertise in captive insurance.

50.   Initially, the Avrahamis retained Hiller, a Phoenix-based lawyer who practices in estate planning, employee benefits, and tax at Fennemore, for some estate-planning services.

51.   In addition, however, the Avrahamis informed Hiller that they were considering forming a captive insurance company and asked for his advice.  Hiller also suggested that the Avrahamis hire Clark. Hiller had previously worked with Clark on another captive insurance matter.

52.   Clark, a founding partner of Clark & Gentry, PPLC (formerly known as the Law Offices of Celia Clark, PLLC), had been involved with captive insurance arrangements since 2002.  Until recently, when she allegedly closed this part of her

practice, a large part of Clark's practice involved the formation and maintenance of such insurance companies. In 2006, she was involved in drafting captive insurance legislation for the Caribbean island nations of St. Kitts and Nevis.  Clark represented that she had more than 50 captive insurance clients in St. Kitts by 2007 and more than 75 by 2008.

53.     Clark had professional relationships and shared clients with Hiller and McEntee prior to meeting the Avrahamis.  After receiving Hiller's endorsement of Clark and captive insurance, the Avrahamis retained Clark to proceed.  In November 2007, they signed a retainer agreement with Clark. Under this agreement, Clark and Hiller were to act as co-counsel and provide all legal services to form a captive insurance company for the Avrahamis for the sum of $75,000.00, with quarterly payments thereafter of $2,000.00 to Clark's firm plus billings by Hiller's firm.  Various fees for the Captive Insurance Strategies, such as actuarial services by ACR, were periodically billed by Clark to the Avrahamis.  This agreement eventually led to the formation of Feedback, the Avrahamis' captive insurance company.  Clark also billed Feedback and others periodically for their involvement in the Captive Insurance Strategy.

54.     In most instances, Clark prepared the documents necessary for the Captive Insurance Strategy to be implemented and then forwarded them to Hiller; Hiller then facilitated the signing of the documents by the Avrahamis (and satisfying any other requirements).  Clark also prepared and forwarded memoranda to the Plaintiffs' advisors with regard to preparation of tax returns, premium payments needed to be made, and annual maintenance items needed for each of the persons and entities involved.

**2.  The Avrahamis Engage in Captive Insurance Strategies from 2007-2015**

55.     In November 2007, Clark incorporated Feedback in St. Kitts, with Ms. Avrahami as Feedback's sole shareholder, and treasurer and bookkeeper.  Feedback, under Clark's control, retained Heritor, a St. Kitts company, to assist with general management, monitor compliance with Kittian regulations, apply for licenses, and process claims.  Heritor is owned by Robin Trevors and charged annual fees in excess of $3,000.00.[6]  Clark also retained RMS to prepare an actuarial report and set premium prices for the captive insurance policies.

56.     By the end of 2007, Feedback applied for and received authorization from St. Kitts to "conduct small group captive insurance business" under the St. Kitts 2006 Captive Insurance Companies Act.  In 2008, it made two elections with the IRS.  First, Clark filed on Feedback's behalf an election under section 953(d) to be treated as a domestic corporation for federal income tax purposes, which was approved by the IRS.  Second, Feedback filed with its 2007 income tax return an election to be taxed as a small insurance company under section 831(b).

57.     For the years 2007 through 2015, Feedback sold insurance policies to various entities owned by the Avrahamis.

---

[6] Defendants utilized many affiliated entities to facilitate the "step transactions" they designed without form or substance.  For example, Robin Trevors is the owner of Feedback's management company, Heritor.  Heritor's sister company, Heritage Services, Ltd. is the registered agent and insurance manager of Pan American, which, as discussed further below, was a reinsurance company integral to the Captive Insurance Strategies.

58.     For example, for the years 2009 and 2010, Feedback issued the following policies to the indicated entities owned by the Avrahamis:

| Insured | Coverage Type | 2009 Premium | 2010 Premium | 2009 limit (occurrence / aggregate) | 2009 limit (occurrence/ aggregate) |
|---|---|---|---|---|---|
| American Findings | Business Income | $271,000 | $213,000 | $3M/$3M | $3M/$3M |
| | Employee Fidelity | 71,000 | 64,000 | $2M/$2M | $2M/$2M |
| | Litigation Expense | 65,000 | 110,000 | $1M/$1M | $1M/$1M |
| | Loss of key employee | 86,000 | 72,000 | $1.5M/ $1.5M | $1M/$1M |
| | Tax indemnity | 75,000 | 75,000 | $2M/$2M | $2M/$2M |
| **Total American Findings** | | **568,000** | **534,000** | | |
| Chandler One | Administrative actions | 30,000 | 33,000 | $1M/$2M | $1M/$2M |
| | Business risk indemnity | 61,000 | 97,000 | $4M/$4M | $3M/$3M |
| **Total Chandler One** | | **91,000** | **130,000** | | |
| O & E | Administrative actions | 33,000 | 33,000 | $1M/$2M | $1M/$2M |
| | Business Risk indemnity | 38,000 | 39,000 | $4M/$4M | $4M/$4M |
| **Total O & E** | | **71,000** | **72,000** | | |
| White Knight | Administrative actions | --- | 34,000 | | $1M/$2M |
| | Business risk indemnity | --- | 40,000 | | $4M/$4M |
| **Total White Knight** | | **---** | **74,000** | | |
| **Total Direct Policies** | | **730,000** | **810,000** | | |

59.     However, pursuant to advice from the Defendants, the Avrahami entities that purchased policies from Feedback did not cease purchasing commercial insurance upon purchasing their Feedback policies.   Instead, they kept purchasing commercial insurance in the manner and amounts set forth in the following charts, which was comparable to what they had been purchasing prior to the inception of Feedback:

27

| American Findings | | | | |
|---|---|---|---|---|
| **Coverage term** | **Insurer** | **Coverage type** | **Premium** | **Limit (occurrence/ aggregate)** |
| 11/10/09-11/10/10 | Jewelers Mutual | Business owners & jewelers block | $58,303 | Various/ $2,000,000 |
| 11/10/09-11/10/10 | Jewelers Mutual | Business owners & jewelers block | 61,352 | Various/ 2,000,000 |

| Chandler One | | | | |
|---|---|---|---|---|
| **Coverage term** | **Insurer** | **Coverage type** | **Premium** | **Limit (occurrence/ aggregate)** |
| 11/16/09-11/16/10 | Travelers | Commercial general liability | $3,294 | $1,000,000/ 2,000,000 |
| 11/16/09-11/16/10 | Travelers | Umbrella | 815 | 1,000,000/ 2,000,000 |
| 11/16/09-11/16/10 | Travelers | Commercial general liability | 3,451 | $1,000,000/ 2,000,000 |
| 11/16/09-11/16/10 | Travelers | Umbrella | 815 | 1,000,000/ 2,000,000 |

| O & E | | | | |
|---|---|---|---|---|
| **Coverage term** | **Insurer** | **Coverage type** | **Premium** | **Limit (occurrence/ aggregate)** |
| 05/01/09-05/01/10 | Travelers | Commercial general liability | 7,477 | $1,000,000/ 2,000,000 |
| 05/01/10-05/01/11 | Allied | Business owners | 7014 | 1,000,000/ 2,000,000 |
| 05/01/10-05/01/11 | AMCO | Umbrella | 500 | $2,000,000/ 2,000,000 |

| White Knight | | | | |
|---|---|---|---|---|
| **Coverage term** | **Insurer** | **Coverage type** | **Premium** | **Limit (occurrence/ aggregate)** |

| 04/10/09- 04/10/10 | Travelers | Commercial general liability | $17,227 | $1,000,000/ 2,000,000 |
|---|---|---|---|---|
| 04/10/09- 04/10/10 | AMCO | Umbrella | 900 | 2,000,000/ 2,000,000 |
| 04/10/10- 04/10/11 | Nationwide | Commercial general liability | 1,572 | $1,000,000/ 2,000,000 |
| 04/10/10- 04/10/11 | Nationwide | Commercial property/building | 11,147 | 5,493,338 |
| | | Commercial property/business income | | 800,001 |

60.     In 2009, the Avrahami entities deducted a total of more than $1.1 million in insurance expenses; in 2010, they deducted more than $1.3 million.[7]

61.     From 2009 onwards, Clark hired Rosenbach and ACR to price Feedback's policies. Unbeknownst to Plaintiffs, Rosenbach was not an independent actuary: out of some 50-80 premium estimates he prepared in 2009 and 2010, most, if not all, were for Clark's clients.  In addition, the narrative sections of his actuarial reports were, in whole or substantial part, a direct cut and paste of the report that RMS had submitted in 2008. Nonetheless, Clark retained Rosenbach and ACR to prepare estimates for Feedback's 2009 and 2010 policies. To determine the premiums, Rosenbach reviewed various documents[8] provided to him by Clark, including the business plan she had drafted for Feedback (which contained the types of coverage Feedback planned to issue), the insurance policy applications from the various Avrahami entities, and the work of Feedback's previous actuary.  Rosenbach then developed his own pricing model for the

---

[7] The IRS has not challenged the validity of the Avrahami entities' commercial policies or the deductions taken for those policies.

[8] All the business documents should have been in place prior to engagement of Rosenbach by Clark so as to not provide or allow opportunity for Clark to establish a level of bias to intentionally and improperly direct or lead Rosenbach to arrive at a certain premium level and/or to manipulate all supporting documents to validated these premium levels.

products. Rosenbach's pricing process was supposed to determine a base premium for each policy and then to adjust that base by various factors; however, as noted, hereafter, Rosenbach and ACR just set the premiums at the level that Clark insisted upon, which appear to be derived by a philosophy of staying close to the maximum $1.2 million premiums allowed under Code for captive insurance deductions to create tax savings that would justify the costs and fees to Clark and the other Defendants.  The Avrahamis had no knowledge that these machinations were occurring or that the premiums were not being set as a matter of normal insurance practice.

62.    Feedback sold the following policies to at least one or more of the Avrahami entities:

a.  Administrative Actions policies—these covered any legal expenses arising from an administrative action or disciplinary proceeding instituted against the policyholder;

b.  Business Risk Indemnity policies—these covered business liabilities caused by "construction defects" or events excluded under the policyholder's commercial policies, such as losses from asbestos, climate change, or fungus;

c.  Business Income policies—these covered business income that American Findings lost as the result of reputational damage or new competition;

d.  Employee Fidelity policies—these covered losses to American Findings caused by fraudulent or dishonest acts committed by one of its employees;

e.  Litigation Expense policies—these covered any expenses American Findings incurred in obtaining legal advice or in prosecuting or defending legal proceedings;

f.  Loss of Key Employee policies—these covered lost business income resulting from the departure of either of the Avrahamis. This type of policy is not generally available in the commercial insurance market; and

g.  Tax Indemnity policies—these supposedly covered additional taxes, interest, and penalties that American Findings might pay resulting from a position taken on its tax return—with exclusions for fraud, criminal conduct, or a willful violation of the law. This type of policy is also not generally available in the commercial insurance market.

63.    As an example, with respect to the Administrative Actions policies, Rosenbach started his premium calculations with a January 2005 Chubb filing. Rosenbach has testified that Chandler One would be considered a "property manager," which according to the June 2005 Chubb filing falls under hazard group 4,  with a base rate of a flat $10,400 for its first $250,000 of gross revenue and then $6.70 per thousand of gross revenue for the next $250,000.  Rosenbach followed this methodology and

calculated a base premium for Chandler One—which for 2009 had expected gross revenue of $470,000—of $11,874.

64.    Once the base premium for Chandler One was set, Rosenbach allegedly adjusted it by five factors:

        a.    The first was a claims-made factor of 1.3, because that was the factor designated in the Chubb filing for a claims-made policy with retroactive coverage for five or more years. [9]

        b.    The second factor was a deductible factor of 2.3., meant to compensate for the fact that the Feedback policy had a different deductible from that of the Chubb policy.

        c.    Rosenbach performed a similar calculation for three other factors—increased limit, endorsement, and coverage.

65.    To reach the total premium, Rosenbach then multiplied the base premium by the five factors. For example, for Chandler One's 2009 policy, Rosenbach calculated a premium of $30,000.

66.    The calculations for the Administrative Actions policies purchased by Chandler One in 2010, O & E in 2009 and 2010, and White Knight in 2010 were

---

[9] In Rosenbach's view, all of the Feedback policies were claims-made with no retroactive date, meaning the incident or event that caused the insured loss could come from any point in time as long as the claim was made during the policy period. The insuring agreement states that Feedback "agrees to pay to the Insured any legal expense incurred by the insured during the Period, arising from or relating to the defense of any Insured Event as defined hereunder, which Insured Event is instituted against the Insured during the Policy Period." The policy defines "Policy Period" as "[e]vents occurring and reported from and after 12:01 a.m. December 15, 2009 and prior to 12:01 a.m. December 15, 2010.

performed in a similar manner. Each used the exact same formula and factors in calculating the base premium.

67.     Rosenbach's pricing model was more complicated for the Business Risk policies because the premiums required three separate calculations. The first was for the premium associated with coverage for events (*i.e.*, major gaps) not covered by a commercial policy. The second was for excess coverage, under which an insurer agrees to indemnify an insured against a loss only if it exceeds the amount covered by another policy. And the third was for the premium associated with "construction defect" coverage.

68.     With the base premium and five factors, Rosenbach reached a 2009 premium for Chandler One of $61,000.  An almost identical calculation was done for the Business Risk Indemnity policy purchased by O & E in 2009. Likewise, the 2010 Business Risk Indemnity policies were calculated in a similar manner, but again with adjustments.

69.     To come up with the premiums for American Findings' 2009 Business Income policy Rosenbach started out with its gross revenue and multiplied it by 7.5%, his assumption being that "you might only expect one policy limit loss every 20 years … [which] would turn into a five percent expected loss, and that expected loss grossed up for expenses and risk will give you a seven and a half percent rate." Then Rosenbach adjusted this amount by an increased limit factor and claims-made factor in the same manner as for the other policies previously discussed. Finally, he multiplied by "judgmental factors" that Rosenbach has said accounted for financial stability, size,

profitability, entry into the market, additional coverages, and a 10% surcharge for "competition and the reputational damage." Multiplying all of these parts together, Rosenbach calculated a premium of $271,000.  American Findings' 2010 policy was calculated in the same manner, but the "adjustment factor" was decreased to 0.65 and the "other" factor was increased to 0.2325.

70.     The 2009 Employee Fidelity policy was priced differently because it represented coverage that existed in the commercial market.  Rosenbach followed the rating methodology of the Chubb employee-fidelity crime-theft filing.  For each factor, Rosenbach allegedly used his judgment and what he knew about the American Findings policy to select a factor from the defined range for that type of factor in the Chubb filing. By multiplying all of the factors times the base premium—also derived from the Chubb filing—Rosenbach reached a premium of $71,000.23.   The calculation of the 2010 premium was exactly the same, but it started with a different base premium.

71.     To come up with the premiums for the 2009 American Findings Business Income policy Rosenbach started out with its gross revenue and multiplied it by 7.5%, this was based on his assumption of a five percent expected loss as described above. Then Rosenbach adjusted this amount by an increased limit factor and claims-made factor in the same manner as described above. He then multiplied by an "adjustment factor" of 0.9 and an "other" factor of 0.165. Rosenbach represented that these "judgmental factors" allegedly accounted for financial stability, size, profitability, entry into the market, additional coverages, and a 10% surcharge for "competition and the reputational damage." Multiplying all of these parts together, Rosenbach calculated a premium of

34

$271,000.   The IRS has long taken the position that business income loss due to competition is not an insurable risk because it presents a moral hazard for businesses to take imprudent risks.

72.    For the 2009 Litigation Expense policy Rosenbach started out with an exposure base of $276,000, which he testified in Tax Court was "basically a function of the underlying expected losses of the given lines of business in the model with an estimate for things outside of the model." Rosenbach explained the base as "an estimate from all different sides of all different exposures that could impact the litigation. So, what would feed into it would be … part of the premium for administrative action, part of the premium for crime, part of the premium for, for all different other coverages." Then Rosenbach multiplied by an "expected loss ratio" of 90%, which was the excuse for his alleged belief that Feedback would have to pay back 90% of the premiums it collected in the form of reimbursements for losses covered by the policy because "most of the captives have a ten percent expense ratio." The next adjustment was a 30% charge for "allocated loss adjustment expense."   According to Rosenbach, this adjustment represented "[a]nything associated with settling claims"—including legal fees—as a portion of the total loss. Rosenbach allegedly used yet another factor of 0.6 because "we're only covering legal expense, the loss is everything beforehand, is covering all the loss and loss adjustment expense, we have to get just the, just the legal fee piece out of it."

73.    Rosenbach gave no consideration for any prior coverage obtained by Plaintiffs or for the historical and claims experience of that prior coverage, that might

properly justify adjustments to various ratios for each event to be covered.   Rosenbach's actions were arbitrary allocations of sub-policy coverage within the captive insurance arrangement to give the false and deceptive appearance of providing unique and/or uncommon coverage that was unavailable in the market.

74.    Rosenbach's model also used an expense ratio of 10%, an increased limit factor of 1.0, and a claims-made factor of 1.3. The total premium of $65,000 calculated by Rosenbach "should just be the product of the factors. . . . Probably one minus the expense ratio, times the 0.6, times the 1.3." The 2010 Litigation Expense policy was calculated in the exact same manner, but with a nearly 60% higher exposure base.

75.    To calculate the 2009 premium for the Loss of Key Employee policy, Rosenbach started with projected gross income of $11 million and multiplied it by an event rate of 5% and an "extra expense factor" of 1.15. He then multiplied by an adjustment factor of 1.5 for "a disability add on" and another factor of 0.5 for the assumption that "the duration of a claim won't last a full year, it'll only last half a year." Multiplying all of the factors together Rosenbach reached a preliminary premium of $474,000.  This preliminary premium was allegedly apportioned to the key employees covered by the policy—the Avrahamis—whose salaries were 18.1% of American Findings' total payroll expense. This led to a final premium of $86,000.   The 2010 premium was calculated exactly the same way.

76.    To price the Tax Indemnity policy, Rosenbach started with the $2 million policy limit and multiplied it by an event rate of 7.5%, allegedly from an IRS study on audit results.   Rosenbach multiplied by an endorsement factor of 1.0 and an "experience

factor" of 0.5. Rosenbach's experience factor was a partially subjective adjustment that accounted for American Findings' ratio of deductions to total revenue and the consistency of its tax returns from year to year. This apparently led Rosenbach to a total premium of $75,000 for 2009, as well as for 2010.

77.    Despite all of these complicated machinations that Rosenbach professed to go through to calculate the premiums for the policies Feedback issued to the Avrahami companies, in actuality Rosenbach calculated these premiums to hit a predetermined "target" set for him by Clark.  Each year, Clark told Rosenbach that the Avrahamis had a "target premium" of $840,000 for the Feedback policies, so that when combined with $360,000 in premiums for terrorism insurance from her company Pan American Reinsurance Company, Ltd. ("Pan American") (discussed below), they would pay $1.2 million for total premiums—the maximum amount deductible under Code § 831(b). After completing his calculations each year, Rosenbach would send them back to Clark for comments.  For example, emails show that Rosenbach initially proposed total Feedback premiums for 2011 of $899,000; Clark then responded with: "I think we should go back to full years for all the policies with $840,000 as the target." Rosenbach then re-calculated total Feedback premiums to be $835,000. This process was similar for each of the years.  The material fact that Rosenbach was "backing into" the premiums rather than making independent actuarial calculations was never disclosed to Plaintiffs.

78.    Collectively, the Avrahami entities paid Feedback premiums for their policies of $730,000 in 2009 and $810,000 in 2010.   Once the premiums were "finalized," Clark drafted the policies.

79.     In addition to the policies Feedback issued to the various Avrahami entities, Feedback also participated in "risk distribution" programs designed by Clark to allow her clients the opportunity to purchase terrorism insurance.  In 2009 and 2010, for example, Feedback participated in a "risk distribution program" through Pan American. Adequate risk distribution was critical to establishing the legality of the Captive Insurance Strategies.  But, as discussed more fully below, the Pan American arrangement did not adequately, properly or legitimately distribute Feedback's risk.  This caused exposure of Plaintiffs to the tax burdens for which they seek relief.  Defendants knew or should have known this at the time they caused Feedback, at great peril, to enter into the dubious arrangement with Pan American, but nevertheless caused Feedback to proceed.

80.     Pan American was incorporated in January 2009 in St. Kitts and was an insurer licensed in and regulated by the Island of Nevis. Pan American's shareholders were two of Clark's children, Diana Gentry and Carl Gentry, along with Laurence Mohn and Sheila Trevors. Clark's children never communicated with Pan American's management or the other shareholders about business matters. Mohn was a "courtesy director,"  who had no duties, had no involvement with day-to-day operations, and had no regular communications with anyone at Pan American.  Sheila Trevors was the wife of Robin Trevors—the owner of Feedback's management company, Heritor. Heritor's sister company, Heritage Services, Ltd. (Heritage), was the registered agent and insurance manager of Pan American, at all material times.

81.     Clark told her clients that the aim of Pan American was:

to "distribute risk" in order to be treated as an insurance company for tax purposes. The IRS considers this requirement to be satisfied if a significant portion

of the insured risk borne by your company is spread among one or more insureds that are unrelated to your company. Case law has established that 30% of the total premiums received by an insurance company represents a significant portion of its risk.

As an experienced tax attorney, Clark knew or should have known that her statements about a *per se* 30% threshold for risk distribution were not true, were false, and were misleading.

82.     Pan American was a scheme designed to connect Clark's clients and build a false critical mass so that they could unlawfully spread the clients' risk to one another by buying and reinsuring terrorism insurance.   Pan American would sell policies to participating businesses and then reinsure—or "cede"—all of the risk through the participating insurance companies pursuant to a Terrorism Risk Quota Share Reinsurance Agreement ("Terrorism Reinsurance Agreement"). Each of the participating insurance companies would pay premiums for terrorism coverage to Pan American, which would deposit them in a trust account, and then return an amount almost equal to what it had received to each of the reinsuring companies. For its services, Pan American received a portion of an "all inclusive" $5,000.00 fee that Clark charged each of her clients for participating in the program.   But if the arrangement was really meant to insure against true risk of terrorism, Pan American should have taken in premiums and maintained adequate reserves for coverage of a Loss or Losses.   In no event should Pan American have collected premiums and then paid out almost all of those premiums to the same parties that paid the premiums in the first place.   Clark's unlawful scheme consisted of collecting funds, skimming $5,000.00 from each unwitting participant, and then remitting back each participant's initial payment (less Clark's $5,000.00 "fee") with no real

purpose of insuring the risk and properly managing the risk in the event there would be a legitimate claim due to "terrorism."   The Avrahamis had no knowledge that Pan American's reinsurance arrangements provided no *bona fide* risk distribution to Feedback and actually and reasonably relied on Clark and others to make sure the arrangement would provide lawful and adequate risk distribution.

83.   Pan American was designed by Clark not to distribute risk, but to funnel the premiums it was paid by the Avrahami entities back to Feedback without regard to the risk distribution necessary for any lawful insurance arrangement.   In 2009 Feedback decided to participate in Pan American's program "at $360,000, calculated at 30% of [its] target premiums for 2009, which [was] $1.2 million."   Under the Terrorism Reinsurance Agreement, Feedback agreed to a reinsurance premium of $360,000 in exchange for accepting 1.797% of Pan American's ultimate total Loss for terrorism coverage. In December 2009, American Findings paid Pan American another $360,000 for "Terrorism Risk Insurance" with a policy limit of $5,525,000 and coverage running from December 15, 2009, to December 15, 2010.   In turn, Feedback received payments from Pan American totaling around $360,000.00.  The same process was repeated in 2010.

84.   In 2009, Pan American wrote policies for 103 insureds and then reinsured the policies through 85 of Clark's captive insurance companies; in 2010, it wrote policies for 139 insureds and reinsured through 101 of Clark's captive insurance companies. Pan American received more than $20 million in premiums in 2009 and almost $23 million in 2010. These amounts were then remitted back in circular fashion to the captive insurance companies of the insureds that initially paid the premiums to Pan American—50% after

90 days and another 47.5% after 180 days. The last 2.5% —about $500,000 in 2009 and $570,000 in 2010—was held back as a "loss reserve" until the policies expired on December 15 of each respective year. Clark told her clients that the loss reserve was intended to build a comfort level for the participants, but that "Nevis law requires loss reserves to be maintained on net premiums only. As designed by Clark, Pan-American would not be retaining any risk or premiums, and therefore would not be required to maintain any loss reserves." Other than premiums receivable, the only assets reported on Pan American's tax returns for 2009 and 2010 were cash or cash equivalents of around $200,000 and $390,000, respectively.[10]

85.    The Pan American risk-distribution program was built around a Terrorism Risk Insurance Pool ("TRIP"). By the terms of TRIP, Pan American agreed to reimburse policyholders for "losses of 'property' and 'expenses' resulting directly from an 'act of terrorism' occurring during the Indemnity Period." TRIP included coverage for damage caused by the dispersion of biological or chemical agents, which is excluded under most—if not all—policies issued under Terrorism Risk Insurance Act of 2002. TRIP excludes acts of terrorism "occurring in a city with more than 1.5 million residents," though TRIP policies notably leave the term "city" undefined. Also, TRIP is a stand-alone terrorism insurance policy, meaning it is not tied to any provisions of another policy.

---

[10] Pan American's scheme,—collecting amounts to build a loss reserve, but then recycling the premiums back to those paying the premiums in a very short period of time— is not prudent conduct by a fiduciary, in the event claims or Losses occurred . Clark's scheme was the circular movement of cash, less her $5000.00 fee in pursuit of tax avoidance, with no real intent of  using premiums to satisfy possible claims.

86.     As with the direct Feedback policies, Rosenbach was hired to calculate the premiums for the Pan American policies.  Rosenbach allegedly did so by performing a market survey of commercial terrorism risk insurance to determine a price for the Pan American policies and then combining this with historical information, catastrophe information, the differences between TRIP and other terrorism policies, and his personal judgment, to recommend a "rate on line"—the premium divided by the occurrence limit—of 5% to 8% for 2009 and 5% to 9% for 2010.  According to Rosenbach, 80% to 90% of these rates are related to the chemical and biological coverage, which is excluded from most commercial terrorism policies, but was covered in Pan American's policies.  Rosenbach's target "rate on line" range was applicable to all of the captives participating in the pool regardless of the type of business being insured or its geographic location.

87.     In addition to its policy from Pan American, American Findings continued to buy add-on terrorism coverage from Jewelers Mutual, its commercial-insurance provider. American Findings paid around $1,500 in 2009 and $1,600 in 2010 for this additional coverage. The Jewelers Mutual policy had a $2 million aggregate limit although it specifically excluded coverage for chemical and biological hazards.  The commercial terrorism premiums cost less than 1% of the premium paid to Pan American for terrorism coverage. Rosenbach falsely represented that this substantial difference in pricing was justified by linking Pan American's premium price to the unique coverage Pan American offered: chemical and biological coverage.  According to Rosenbach's false analysis, American Findings was justified in paying almost $360,000 for chemical and biological terrorism coverage and less than $2,000 for all other terrorism risks.

88.     In 2009, the Avrahamis' entities paid Feedback $730,000 in premiums, American Findings paid Pan American $360,000 for terrorism insurance, and Pan American paid Feedback $360,000 in reinsurance premiums. In 2010, the Avrahamis' entities paid Feedback $810,000 in premiums, American Findings paid Pan American $360,000 for terrorism insurance, and Pan American paid Feedback $360,000 in reinsurance premiums.  The Avrahami entities collectively deducted as business expenses insurance premiums of $1,090,000 for 2009 and $1,170,000 for 2010.

89.     No claims were filed against Feedback under any of its policies in either 2009 or 2010.  And no events took place triggering a claim under the terrorism insurance in either year. As a result, Feedback quickly accumulated a surplus, which it used to transfer funds to Mrs. Avrahami and Belly Button Center, LLC ("Belly Button").  Belly Button was formed in 2007 and owned equally by the Avrahamis' three children. Belly Button owned, at all material times, land in Snowflake, Arizona, which it purchased for approximately $1,960,000, using $1.2 million in cash from Mr. Avrahami and the rest with a note payable to the sellers. The $1.2 million from Mr. Avrahami was reported on Belly Button's tax return as a liability "due to affiliates" and was reflected by an unsecured promissory note signed by Mr. Avrahami for $1.2 million payable by April 2017, with interest at 4%.

90.     In March 2010, Feedback transferred $1.5 million to Belly Button and reported the amount on its tax return under "Mortgage and real estate loans." The next day Mr. Avrahami—on behalf of Belly Button—executed a $1.5 million promissory note payable to Feedback. This note was *unsecured* and carried an interest rate of 4% per

year—simple interest accruing "from time to time"—and was due in March 2020. Two days after this transfer of funds from Feedback to Belly Button—and the day after Mr. Avrahami executed the $1.5 million promissory note—the Avrahamis transferred $1.5 million from Belly Button's bank account into their personal one.  These actions were all performed pursuant to the specific advice and counsel Plaintiffs received from the Defendants.

91.    Feedback's loan to Belly Button was not like most loans involving real estate.  In a typical lending transaction involving real estate, the promissory note is secured by the real estate held as collateral for the promissory note; further, payments on the debt service are amortized to include principal and interest.  Here, Defendants advised Plaintiffs to enter into a ten-year note that was unsecured and with payments "from time to time."

92.    In December 2010, $200,000 went directly from Feedback's account to Mrs. Avrahami. The transfer was papered just like the transfers that had gone through Belly Button. There was a promissory note due on demand, but no earlier than December 2012, carried an interest rate of 3% per year, signed by Mr. Avrahami on behalf of Belly Button, and reported on Feedback's 2010 tax return as a mortgage and real estate loan.

93.    Feedback did not seek approval from its Kittian regulators for any of these transfers to Belly Button or to Mrs. Avrahami before making them.  Clark disclosed the three transfers to Heritor in March 2014. Heritor communicated the information to the St. Kitts's Registrar of Captive Insurance Companies in September 2014.

94.    After 2010, Plaintiffs continued to implement the Captive Insurance Strategies by paying premiums and taking losses until 2015.  The premium pricing and tax positions of the 2011-2015 Captive Insurance Strategies relied on Defendants' same flawed methodologies and professional advice as those relied upon for the 2009 and 2010 tax years.

95.    All of the foregoing actions were taken by the Avrahamis and the other Plaintiffs in reliance on the advice and counsel they received from the Defendants.  Clark and Hiller were both directly involved in structuring and recommending these unlawful loan transactions.

### 3.  The Defendants Misrepresentations and Omissions from 2007-2015

96.    From 2007 through 2015, Defendants made numerous misrepresentations and omissions regarding the Captive Insurance Strategies.  These misrepresentations and omissions were false because they (1) misstated the tax treatment Plaintiffs would receive, (2) misrepresented, either expressly or by implication, that Feedback and Pan American were *bona fide* insurers offering *bona fide* insurance policies, and/or (3) misrepresented that the Defendants supplied arm's-length services that complied with the professional standards and customs of Defendants' industries.

97.    On October 25, 2007 Celia Clark and Clark & Gentry made misrepresentations and omissions in an engagement letter that she sent to the Avrahamis by email.  Without limitation, the misrepresentations and omissions in the October 25, 2007 engagement letter include:

   a.  Clark would "oversee[] the creation and maintenance of one closely-held insurance company ... to be tax qualified under IRC Section

831(b)," which was false when made because Clark would not oversee the creation and maintenance of a *bona fide* insurance company, and the company would not be qualified under IRC Section 831(b).

b. Clark would "prepare[] … all insurance license application papers for" the Captive, which was false when made because the Captive was not a *bona fide* insurance company.

c. Clark would "work[] with the insurance manager on creation of the [Captive's] business plan and design of insurance policies," which was false when made because the Captive was not a *bona fide* insurance company and because it falsely implied that the "insurance manager" would supply arm's-length services that complied with the professional standards and customs of the insurance industry.

d. Clark would "oversee[] the insurance manager with respect to regulatory compliance," which was false when made because the Captive did not comply with applicable tax and insurance regulations.

e. Clark would "hir[e] and oversee[] professionals for premium analysis certification" which was false when  made because the Captive was not a *bona fide* insurance company, meaning the money it received did not constitute "premiums," and because it falsely implied that the "professionals" would supply arm's-length services

that complied with the professional standards and customs of the insurance, underwriting, and actuarial industries.

    f.   Clark would "review[] tax returns prepared by the [Captive's] accountant" which was false when made because it falsely implied that Clark's review would ensure compliance with the Tax Code, including IRC Section 831(b).

98.    On October 25, 2007, Clark and Clark & Gentry misrepresented in a memorandum regarding Tax and Financial Reporting Requirements sent to the Avrahamis by email, with courtesy copies to John Kelly, Neil Hiller, and Craig McEntee, that "[y]our small captive insurance company was formed under Internal Revenue Code … Sec. 831(b)." This representation was false because the Captive was not formed or operated in a manner that complied with Section 831(b) of the Internal Revenue Code.

99.    On December 5, 2008 Clark and Clark & Gentry misrepresented in a memorandum regarding December 2007 Cross Insurance Pool sent to the Avrahamis (and possibly others) by email that:

> As you know, your captive insurance company is required to "distribute risk" in order to be treated as an insurance company for tax purposes. The IRS considers this requirement to be satisfied if a significant portion of the insured risk borne by your company is spread among one or more insureds that are unrelated to your company. Case law has established that 30% of the total premiums received by an insurance company represents a significant portion of its risk.

This representation was false when made because case law had not established that 30% of the total premiums received by an insurance company, standing alone, represents a significant portion of its risk. Case law had instead established that risk distribution turns

on a variety of factors, and there was no safe harbor based on the percentage of premiums received.  Clark and Clark & Gentry made this identical misrepresentation in letters sent to the Avrahamis (and possibly others) on November 9, 2009 and November 8, 2010.

100.　　On November 9, 2009 Clark and Clark & Gentry again misrepresented in a memorandum regarding December 2009 Risk Distribution Program: Structure of Reinsurance Arrangement and Trust Account sent to the Avrahamis (and possibly others) by email that:

> As you know, your captive insurance company is required to "distribute risk" in order to be treated as an insurance company for tax purposes. The IRS considers this requirement to be satisfied if a significant portion of the insured risk borne by your company is spread among one or more insureds that are unrelated to your company. Case law has established that 30% of the total premiums received by an insurance company represents a significant portion of its risk.

This representation was false when made because case law had not established that 30% of the total premiums received by an insurance company, standing alone, represents a significant portion of its risk.  Case law had instead established that risk distribution turns on a variety of factors, and there was no safe harbor based on the percentage of premiums received.

101.　　On January 21, 2009 Clark and Clark & Gentry misrepresented in a letter regarding List of Events to Take Place Before 12/31/09 for Insurance Companies Formed in 2008 sent to the Avrahamis (and possibly others) by email that:

> Simultaneously with the issuance of insurance coverage to the operating businesses, Pan-American and captive insurance companies affiliated with the operating businesses will enter into a quota-share reinsurance agreement obligating each captive insurance company to assume a percentage of the risk of Pan-American to all of the operating businesses participating in the transaction.

48

This representation was false when made because the agreements made with Pan American did not distribute or reinsure actual risks of the operating businesses participating in the transaction.

102.    On February 23, 2010, Clark and Clark & Gentry misrepresented in a letter regarding Tax and Financial Reporting Requirements for Feedback Insurance Company, Ltd. sent to the Avrahamis by email, with courtesy copies to John Kelly and Craig McEntee, that:

>      a.  "The Company was formed under Internal Revenue Code ("IRC") Sec. 831(b), and the requirements for this type of company are described below," which was false when made because the Captive was not formed or operated in a manner that complied with Section 831(b) of the Internal Revenue Code; and
>
>      b.  "This memorandum will set forth the tax reporting and financial reporting requirements applicable to the above referenced captive insurance company," which was false when made because the memorandum did not set forth the tax and financial reporting requirements for the Captive, and, in fact, Defendants did not form or operate the Captive in a manner that complied with tax reporting and financial requirements.

103.    On February 3, 2011, Clark and Clark & Gentry misrepresented in a letter regarding Tax and Financial Reporting Requirements for Feedback Insurance Company,

Ltd. sent to the Avrahamis by email, with courtesy copies to John Kelly and Craig McEntee, that:

a. "The Company was formed under Internal Revenue Code ("IRC") Sec. 831(b), and the requirements for this type of company are described below," which was false when made because the Captive was not formed or operated in a manner that complied with Section 831(b) of the Internal Revenue Code; and

b. "This memorandum will set forth the tax reporting and financial reporting requirements applicable to the above referenced captive insurance company," which was false when made because the memorandum did not set forth the tax and financial reporting requirements for the Captive, and, in fact, Defendants did not form or operate the Captive in a manner that complied with tax reporting and financial requirements.

104.    In addition to the foregoing misrepresentations and omissions, Clark and Clark & Gentry created or caused Feedback to create numerous documents that fomented the false and inaccurate impression that Feedback or Pan American was providing *bona fide* insurance.  These documents were sent by email and include, without limitation:

a. December 26, 2007 Feedback invoices sent to Benjamin Avrahami by Heritor, Clark, and/or Clark & Gentry;

b. December 28, 2007 Feedback insurance certificates sent to BYS by Heritor, Clark, and/or Clark & Gentry;

c.  December 28, 2007 Feedback insurance certificates sent to Chandler One by Heritor, Clark, and/or Clark & Gentry;

d.  December 28, 2007 Feedback insurance certificates sent to O & E by Heritor, Clark, and/or Clark & Gentry;

e.  December 28, 2007 Feedback insurance certificates sent to White Knight by Heritor, Clark, and/or Clark & Gentry;

f.  December 28, 2007 Feedback insurance certificates sent to American Findings by Heritor, Clark, and/or Clark & Gentry;

g.  July 23, 2008 insurance renewal application sent to Benjamin Avrahami by Paul Molluzo of Clark & Gentry;

h.  August 8, 2008 letter regarding Policy Renewals sent to Benjamin Avrahami by Patricia Cordova of Clark & Gentry;

i.  December 15, 2008 Feedback insurance certificates sent to Chandler One by Heritor, Clark, and/or Clark & Gentry;

j.  December 15, 2008  Feedback insurance certificates sent to O & E by Heritor, Clark, and/or Clark & Gentry;

k.  December 15, 2008  Feedback insurance certificates sent to White Knight by Heritor, Clark, and/or Clark & Gentry;

l.  December 15, 2009 Feedback invoices sent to Benjamin Avrahami by Heritor, Clark, and/or Clark & Gentry;

m. December 17, 2009 Feedback invoices sent to Benjamin Avrahami by Heritor, Clark, and/or Clark & Gentry;

n.  December 23, 2009 Feedback invoices sent to Benjamin Avrahami by Heritor, Clark, and/or Clark & Gentry;

o.  October 1, 2010 email from Diana Chen of Clark & Gentry to the Avrahamis stating "[t]he following insurance policies issued by Feedback Insurance Co., Ltd. will expire on December 15, 2010";

p.  November 19, 2010 email from Brenda Levin of Clark & Gentry to the Avrahamis attaching various insurance applications;

q.  December 16, 2010 email from Diana Chen to the Avrahamis relating total premium pricing for purported Feedback insurance policies;

r.  December 20, 2010 Feedback invoices sent to Benjamin Avrahami by Heritor, Clark, and/or Clark & Gentry;

s.  December 22, 2010 Feedback insurance certificates sent to Chandler One by Heritor, Clark, and/or Clark & Gentry;

t.  December 22, 2010 Feedback insurance certificates sent to O & E by Heritor, Clark, and/or Clark & Gentry;

u.  December 22, 2010 Feedback insurance certificates sent to White Knight by Heritor, Clark, and/or Clark & Gentry;

v.  December 22, 2010 Feedback insurance certificates sent to American Findings by Heritor, Clark, and/or Clark & Gentry;

w.  December 12, 2011 Feedback insurance certificates sent to White Knight by Heritor, Clark, and/or Clark & Gentry;

x.  December 12, 2011 Feedback insurance certificates sent to Junction Development by Heritor, Clark, and/or Clark & Gentry;

y.  December 12, 2011 Feedback insurance certificates sent to American Findings by Heritor, Clark, and/or Clark & Gentry.

105.   McEntee and McEntee & Associates also sent tax returns to Plaintiffs that contained tax positions that McEntee and McEntee & Associates knew to be false.  On or about the time Plaintiffs signed these returns, McEntee and McEntee & Associates contacted Plaintiffs by email, phone, and/or the mail to facilitate preparation and signing of returns.   These returns include, without limitation, the returns sent on or about the following dates:

a.  March 3, 2008 Form 1120-PC for Feedback;

b.  March 13, 2009 Form 1120-PC for Feedback;

c.  May 21, 2010 Form 1120-PC for Feedback;

d.  March 24, 2011 Form 1120-PC for Feedback;

e.  July 19, 2012 Form 1120-PC for Feedback;

f.  August 8, 2013 Form 1120-PC for Feedback;

g.  April 29, 2010 Form 1120S for American Findings;

h.  May 23, 2011 Form 1120S for American Findings;

i.  July 28, 2012 Form 1120S for American Findings;

j.  June 13, 2013 Form 1120S for American Findings;

k.  April 3, 2008 Form 1120S for BYS;

l.  March 12, 2009 Form 1120S for BYS;

m. March 12, 2010 Form 1120S for BYS;

n. May 23, 2011 Form 1120S for BYS;

o. July 24, 2012 Form 1120S for BYS;

p. June 13, 2013 Form 1120S for BYS;

q. March 7, 2008 Form 1120S for O & E;

r. March 12, 2009 Form 1120S for O & E;

s. March 12, 2010 Form 1120S for O & E;

t. May 23, 2011 Form 1120S for O & E;

u. March 10, 2012 Form 1120S for O & E;

v. April 30, 2013 Form 1120S for O & E;

w. March 7, 2008 Form 1120S for White Knight;

x. March 13, 2009 Form 1120S for White Knight;

y. March 12, 2010 Form 1120S for White Knight;

z. May 23, 2011 Form 1120S for White Knight;

aa. March 10, 2012 Form 1120S for White Knight;

bb. June 13, 2013 Form 1120S for White Knight.

106.   Hiller, Fennemore, McEntee, and McEntee & Associates also made numerous oral misrepresentations and omissions to the Avrahamis in late October through November 2007.  Like Defendants' written misrepresentations and omissions, these oral misrepresentations were false, and Hiller, Fennemore, McEntee, and McEntee & Associates knew they were false when made, because they (1) misstated the tax treatment Plaintiffs would receive, (2) misrepresented, either expressly or by implication,

54

that the Captive Insurance Strategies provided *bona fide* insurance, and/or (3) misrepresented that the Defendants supplied arm's-length services that complied with the professional standards and customs of Defendants' industries.  In connection with these misrepresentations and omissions, Hiller, Fennemore, McEntee, and McEntee & Associates coordinated with each other and the Avrahamis using email, phone calls, and the mail.  These efforts included, without limitation, the following emails:

    a.  October 25, 2007 emails exchanged among Hiller, Clark and McEntee regarding "Celia R. Clark ---Answers to Your Questions";

    b.  October 28-29, 2007 emails exchanged among Hiller, Clark, McEntee, and Orna Avrahami regarding "Avrahami";

    c.  October 29, 2007 email from Hiller to Orna Avrahami and Celia Clark forwarding Clark's false and fraudulent retainer agreement;

    d.  October 31, 2007 emails exchanged among Hiller, Clark, McEntee, and Orna Avrahami regarding "Letter from the Bank"

107.   In addition to the foregoing misrepresentations and omissions, Pan American caused Clark or Heritor to forward to Plaintiffs, via email and/or mail, insurance applications including applications, including, without limitations, applications sent on December 12, 2008, November 24, 2009, and December 1, 2011.   These applications created the false and misleading impression that Pan American provided *bona fide* insurance.

108.   In furtherance of the Captive Insurance Strategies, RMS, Rosenbach, and ACR also sent emails to Clark containing misrepresentations and omissions regarding

Feedback policy pricing.  RMS sent an actuarial report by email on or about December 10, 2008.  Rosenbach and ACR also sent actuarial reports by email on or about December 31, 2009 and December 20, 2010.  Clark knew that these actuarial reports contained misrepresentations and omissions.  But Clark nevertheless forwarded these misrepresentations and omissions to Plaintiffs by incorporating the pricing determinations in these reports into Feedback's premiums.

## D.    PLAINTIFFS' TAX RETURNS, AUDITS AND OTHER IRS ACTIONS

### 1.    Feedback's Returns

109.    Feedback timely filed its 2009 - 2010 tax returns. On both returns, Feedback indicated that it had previously made an election under section 953(d) (*i.e.*, to be treated as a domestic corporation for federal income tax purposes) and made current-year elections for Feedback to be treated and taxed as a small insurance company under section 831(b). Feedback's tax returns reported total assets of almost $2.4 million at the end of 2009 and nearly $3.9 million at the end of 2010, but because of the section 831(b) election it paid income tax only on its investment income—*i.e.*, on interest, but not on the premiums it had received.

### 2.    The Avrahamis' Returns

110.    The Avrahami also filed 2009 and 2010 personal tax returns, reflecting income, loss, and any insurance-expense deductions that passed through to them from their numerous partnerships and S corporations, including the Avrahami entities involved in the captive insurance arrangements discussed herein. These insurance-expense deductions are as follows:

| Year | American Findings | Chandler One | O & E | White Knight |
|---|---|---|---|---|
| 2009 | $975,650 | $95,078 | $78,477 | $17,227 |
| 2010 | 1,029,512 | 134,849 | 79,539 | 87,675 |

Pursuant to the Defendants' representations and advice, the Avrahamis did not report the amounts transferred to them from Belly Button—$1.5 million—or from Feedback—$200,000.  Rather, Defendants advised the Avrahamis to assert that the cash that flowed from Belly Button went just to repay loans.

### 3.    The Audit and the Claims

111.   The IRS began auditing the Avrahamis' 2009 return in March 2012 and later expanded the audit to include their 2010 return as well as the returns from Feedback and the Avrahami entities. In January 2013, the IRS mailed the Avrahamis documents explaining the examination changes for American Findings, Chandler One, O & E, and White Knight. In May 2013, for tax year 2009, the IRS sent Feedback a statutory notice of deficiency determining  that Feedback was not a valid insurance company and determining that "the amounts characterized as insurance premiums" were income to Feedback.  The IRS later issued notices of deficiency for the 2011, 2012, and 2013 tax years.

112.   The statutory notice of deficiency for tax year 2009 determined that from Feedback's inception in 2007 to the end of 2010, Feedback had received premiums totaling almost $3.9 million but had paid no claims. It also noted that one of the nonexclusive factors for determining whether a captive insurance company is a sham is "[w]hether any claims were filed with the captive; if claims were filed – whether the

validity of the claims was established before payments were made on them." This triggered Clark to submit claims to Feedback in March 2013 on behalf of the insured entities in the following amounts:

| Entity | Date of claim | Policy/period | Nature of loss | Amount |
|---|---|---|---|---|
| American Findings | 03/19/2013 | Business income/ 2011-2012 | Ring dispute | $9,800 |
| American Findings | 03/19/2013 | Litigation expense/ 2011-2012 | Ring dispute litigation | 2,816 |
| White Knight | 04/05/2013 | Business risk/ 2011-2012 | Roof repairs | 58,248 |
| Junction Development | 04/05/2013 | Business risk/ 2011-2012 | Building repairs | 2,519 |
| American Findings | 09/06/2014 | Business risk/ 2013-2014 | Water damage | Pending |
| American Findings | 09/30/2014 | Litigation expense/ 2013-2014 | Tax Court litigation | 48,965 |

113.   Feedback's policy was to deal with claims on an "ad hoc basis." For each claim, Clark determined whether it appeared to be covered, drafted a claim notification, requested a notification extension (if needed), prepared a sworn statement in proof of loss, and sent everything to Heritor along with supporting documents. Heritor then sent a letter back to Clark approving the claims. All of this was done without notification to and consent from the Avrahamis.  The IRS questioned whether several of the claims should have been approved. The Business Risk policies under which the claims were made all contain provisions requiring that Feedback receive the claim notification within the policy period. Yet Heritor granted notification extensions and approved claims filed in April 2013 for policies that ended December 15, 2012.

114.    The Avrahamis weren't alone in having returns audited because of their interactions with Captive Insurance Strategies. The IRS has applied increased scrutiny to these transactions, adding them to the "dirty dozen" list of tax scams in 2015 (and for each of the years thereafter) and declaring them "transactions of interest" in 2016. *See* Notice 2016-66, 2016-47 I.R.B. 745; I.R.S. News Release IR-2015-19 (Feb. 3, 2015). The Avrahamis' case, however, was the first section 831(b) case to be tried in the United States Tax Court.

115.    The IRS determined deficiencies of nearly $380,000 for 2009 and $990,000 for 2010, plus almost $275,000 in penalties. These deficiencies are the result of three major adjustments:

- an increase in the income passed through to the Avrahamis from American Findings, Chandler One, O & E, and White Knight of more than $1 million for both 2009 and 2010;

- recharacterization of the $1.5 million transfer from Feedback to Belly Button and the $200,000 transfer from Feedback to Mrs. Avrahami as "other income" on the Avrahamis' 2010 return; and

- a computational adjustment that decreased the amount of medical expense deductions allowed each year.

116.    The IRS examination report for American Findings summarized the IRS's position as follows:

> In summary, we find that, when all related transactions of Feedback are reviewed remotely, the primary, if not only, motivation for Feedback's formation was/is for its tax favorable characteristics as part of an estate planning strategy thinly disguised as an asset protection plan:
>
> 1. The insurance premiums paid to the captive generate tax deductions at the source thus lowering the taxable income of Avrahami,

2. The premiums received by the captive are not subject to tax as long as they are below $1.2M annually- which to date they are,

3. The captive's claims experience to date is $0,

4. Thus, based on the life of the captive to date, premiums received are effectively tax-free steady streams of cash that are available for the owner of the captive to transfer to other entities completely controlled by the captive's owners, and

5. The loans of $830,000 and $1,500,000 to the controlled LLC are used by the LLC to pay off loans initiated by Avrahami to make payments directly to Avrahami.

6. In addition funds of $200,000 were received by Avrahami directly from Feedback in December 2010.

117.    Thus, the IRS concluded *inter alia* that the Captive Insurance Strategies lacked economic substance, violated the step transaction doctrine and were a sham. Feedback and the Avrahamis were assessed taxes of $1,368,048 and interest for 2009 and 2010; they were also assessed penalties for the two years of $75,679.80 and $197,929.80 respectively. Clark, Hiller and the other Defendants nonetheless continued to tout to the Plaintiffs that the Captive Insurance Strategies were valid and legitimate and encouraged them to petition the Tax Court for a redetermination of these assessments.

**E.    PLAINTIFFS' TAX COURT PROCEEDINGS**

118.    After being unable to resolve their matters administratively with the IRS, both Feedback and the Avrahamis filed petitions in Tax Court.  These matters were consolidated for trial.  The issues raised in the Feedback matter were resolved through a stipulation of settled issues filed on March 12, 2015.

119.   The remaining issues in the consolidated cases were tried before Judge Mark V. Holmes in Phoenix, Arizona beginning on March 16, 2015.   Judge Holmes issued an opinion (the "Opinion") on August 21, 2017 ruling against Plaintiffs.

120.   The Opinion found numerous defects in the Captive Insurance Strategies. These defects derive from longstanding United States Supreme Court, appellate court, and Tax Court authorities.   Experienced tax professionals like the Defendants knew or should have known about these standards when they designed, developed, promoted, sold, and implemented the Captive Insurance Strategies.

121.   The Tax Court first analyzed whether the transactions at issue involved "insurance" for federal income tax purposes.   To make this determination, the Tax Court considered all the facts and circumstances and decided whether the arrangements involved risk shifting, risk distribution, and insurance risk, and met commonly accepted notions of insurance.   The Court reasoned that if an arrangement failed to meet any of these criteria, it cannot qualify as "insurance" for federal income tax purposes.   The Tax Court has applied this framework since at least 1991 and the IRS has long maintained that insurance requires "fortuity" and protection against outside peril that many, if not all, of Feedback's policies lacked. Experienced tax and insurance professionals like Defendants knew or should have known of the legal standard for "insurance" under the Code.   They further would have understood that the Captive Insurance Strategies did not meet this standard.

122.   The Defendants purported they were specialists and/or experts in the captive insurance industry.   The Defendants certainly knew the "sham" they were

promoting to Plaintiffs involving circular tax-free loans, deductions for tax avoidance, no economic substance or realistic form for the purpose of the insurance and step transactions to facilitate and fund.

123.    The Tax Court found that the Captive Insurance Strategies were not "insurance" for federal income tax purposes for two independent reasons.  First, the Captive Insurance Strategies did not adequately distribute risk.  Second, the Captive Insurance Strategies did not meet commonly accepted notions of insurance.

124.    Risk distribution occurs when the insurer pools a large enough collection of unrelated risks.  The idea is based on the law of large numbers—a statistical concept that theorizes that the average of a large number of independent losses will be close to the expected loss.

125.    The Tax Court further held that the contracts among Feedback, the Avrahamis' entities, and Pan American failed to distribute risk adequately for two reasons.   First, the contracts among Feedback and the Avrahamis' entities were insufficient, standing alone, to distribute risk because the contracts were too few in number and covered an insufficient number of risk exposures.  The contracts were too few in number because Feedback only issued policies to three Avrahami entities in 2009 and four Avrahami entities in 2010.[11] The contracts covered an insufficient number of risk exposures because they covered only three jewelry stores, two key employees, and around thirty-five employees.  In comparison, courts have upheld the *bona fides* of insurance arrangements where the captive insurer, for example, (a) issued 951 policies

---

[11] Expert testimony offered at trial set the lowest level for risk distribution at seven associated entities.

covering more than 750,000 vehicles, 2,000 real estate properties, and 1.3 million equipment assets in seven different geographic regions; (b) provided workers' compensation, automobile, and general liability policies that covered more than 14,000 employees, 7,100 vehicles, and 2,600 stores in all 50 states; or (c) insured more than twenty corporations operating more than sixty hospitals with more than 8,500 beds. With this in mind, the Defendants knew or should have known that Feedback's contracts with the Avrahamis' entities could not, without more, distribute risk sufficiently to be considered insurance for federal income tax purposes. Nonetheless, the Defendants falsely represented to Plaintiffs that these contracts would qualify as insurance for income tax purposes.

126. Second, Feedback's participation in the Pan American program did not reinsure third-party risk. This is so because Pan American was not a *bona fide* insurer for income tax purposes because it involved a circular flow of funds, charged unreasonably high premiums, and did not negotiate arm's-length policies. Pan American paid all of the premiums that it received from the Avrahamis' entities to another of the Avrahamis' entities, Feedback. Pan American charged the Avrahamis' entities an 80-fold increase in premiums compared to similar, commercially available policies; the policies "insured" against very rare events that had never occurred before, and Pan American was very thinly capitalized relative to the exposure of aggregate losses it could theoretically incur. Tax professionals like Defendants knew or should have known that these features in Pan American's structure and operations would disqualify it as an insurance company for income tax purposes.

127.   Feedback's policies were not insurance because Feedback did not look like an insurance company in the commonly accepted sense.  This is  examined based on whether the company was organized, operated, and regulated as an insurance company; whether the insurer was adequately capitalized; whether the policies were valid and binding; whether the premiums were reasonable and the result of an arm's length transaction; and whether claims were paid.   Another problem was that Feedback processed claims in an ad-hoc fashion, processed no claims until well into the IRS's audit, paid stale claims, and invested its assets in loans to related entities.  Prior to the issuance of the Captive Insurance policies, the IRS had already indicated in Notices 2002-89 and 2005-49 that it would view loan backs from captives to affiliates of their parent with suspicion.  Moreover, no feasibility study was done to establish the need by Plaintiffs for such insurance.

128.   Feedback's policies were drafted by Clark in a sloppy manner and its premiums (calculated by Rosenbach in accordance with the guidelines given by Clark) were "utterly unreasonable."  Prior to purchasing Feedback's policies, the Avrahamis' entities spent about $150,000 on insurance.  With Feedback, the Avrahamis' insurance bills soared to more than $1.1 million in 2009 and more than $1.3 million in 2010.  And while the Avrahamis' entities were paying Pan American and Feedback a little less than $1.2 million per year, they were also maintaining commercial coverage for less than $90,000 a year.  The premiums were, in fact, set as instructed by Clark and manipulated to achieve tax benefits, divorced completely from economic reality.

129.   The payments made to Feedback and Pan American were not premiums for insurance.  As a result, these sums were not deductible for income tax purposes.  The Avrahamis were held liable for back taxes and interest.[12]   In summary, as one commentator has noted, in speaking about the Opinion:

> the court placed **great emphasis on the operations and procedures of the captive** — as in, **did it function and operate in a customary manner one would expect from an insurance company**?
>
> **The court focused on whether the company was organized, operated and regulated as an insurance company, whether it was adequately capitalized, whether policies were valid and binding, whether premiums were reasonable and at arm's length and whether claims were paid.** What we learned is that the court will focus on the claims process — not only whether claims were filed, but whether they were appropriately processed under existing procedures and paid out.
>
> ***
>
> **In addition to claims, the court focused on policies, premiums and actuarial work**. **It analyzed the policies and found them to be less than a model of clarity**. The court was confused as to whether the policies were claims made or occurrence policies, as they had elements of both.
>
> It then looked at the **reasonableness of premiums** and seemed skeptical of how insurance premiums for the Avrahamis rose from $150,000 to $1.1 and $1.3 million.

Steven Miller, "Avrahami Ruling On Microcaptives Offers Little Guidance," Law360 (Sept. 19, 2017).

130.   Plaintiffs relied upon Clark and the other Defendants for their guidance and alleged "expertise" on all matters involving the operations and procedures of the captives.

---

[12] The Avrahamis avoided penalties on most but not all of their back taxes because the Tax Court found that they reasonably relied in good faith on Hiller when implementing the Captive Insurance Strategies.

131.   About one month after the issuance of the Opinion, and without any advance notice whatsoever, on September 29, 2017, Clark sent a notice to Plaintiffs and her other clients entitled "Termination of Captive Services" stating the following:

> I am sorry to announce Clark & Gentry, P.L.L.C. will be closing down its captive operations effective December 31, 2017.

132.   Despite the foregoing, following the issuance of the Opinion, the Defendants encouraged the Plaintiffs to continue to litigate in an effort to sustain the tax benefits of the Captive Insurance Strategies, which they continued to insist were valid under the Code.  They even offered to pay for legal fees incurred in the filing of any post-trial motions and appeals in an effort to encourage Plaintiffs to do so.

133.   Plaintiffs, following the Opinion, however, filed their own Motion for Reconsideration (the "Motion to Reconsider") in which they argued two grounds:

> (1) Feedback Insurance Company, Ltd. ("Feedback") operated like an insurance company when it relied upon its qualified advisors; and (2) the insurance policies at issue were claims made, not occurrence policies, with clear and consistent terms.

These grounds were submitted in support of the following sole issue:

> Whether the amounts paid and incurred by Petitioners' businesses are deductible insurance premiums under I.R.C. § 162.

The Avrahamis relied primarily on the following argument in support of the Motion to Reconsider:

> The Avrahamis relied upon highly credentialed professionals to operate and oversee all aspects of Feedback's insurance business. …  Feedback relied upon competent advisors and professionals to ensure it was operated as an insurance company.

134.    On November 14, 2017, the Tax Court rejected Plaintiffs' arguments and denied their Motion to Reconsider, holding:

> The question of whether an arrangement looks like insurance doesn't depend on whether those appearances flowed from professional advice but what actually happened. Here, some of the key facts were the extreme illiquidity of Feedback's investment portfolio -- so skewed toward flowing funds back to the Avrahamis that it had no other significant investments -- and the very telling pattern of receiving claims only after the IRS started an audit.

135.    Plaintiffs relied on the expertise of their credentialed professionals to properly advise, guide, direct, and operate these highly sophisticated structures and to make sure they are structured, managed, maintained, operated in strict compliance of the various laws.    In this case, the Defendants wrongfully advised the Plaintiffs that the arrangements they were entering into were the correct and compliant way to run a captive insurance company and assured Plaintiffs that they were in the best credentialed professional hands (*i.e.*, the Defendants') to handle the entire process from A to Z for the creation and operation of their captive insurance company, including but not limited to need for the insurance selected, setting of competitive and appropriate premiums, and appropriate levels of coverage. Plaintiffs reasonably relied on their trusted advisors to handle all the "red tape" and compliance requirements involved with structuring and using such a sophisticated structure, as well as to ensure that the resulting tax deductions were supported by business purpose and economic substance.

136.    The Defendants continued to aggressively advise Plaintiffs to appeal the Opinion, but Plaintiffs have instead chosen to file this suit and seek damages and other recovery from the Defendants for their unlawful acts and omissions, as set out herein.

# IV.

## CONSPIRACY ALLEGATIONS

137.   Each of the Defendants and the Other Participants involved in the Captive Insurance Strategies executed by Plaintiffs conspired with one another to design, promote, sell, and implement the Captive Insurance Strategies for the purpose of receiving and splitting substantial fees (the "Defendants' Arrangement").  The receipt of those fees was the primary, if not sole, motive in the development and execution of the Captive Insurance Strategies.  Further, the amount of fees earned by the Defendants and the Other Participants was not tied to or reflective of the amount of time and effort they expended in providing tax, investment, legal or accounting services, but rather was a flat fee.  The Defendants and the Other Participants designed the Captive Insurance Strategies and unlawfully agreed to provide a veneer of legitimacy to each other's opinions on the lawfulness and tax consequences of the Captive Insurance Strategies.

138.   The Defendants and the Other Participants aggressively put their scheme into action.  The Defendants and the Other Participants fraudulently solicited their own clients to enter into the Captive Insurance Strategies.  The Defendants, directly or through the Other Participants, identified the Plaintiffs (and other successful individuals) as potential clients based on their knowledge of their finances.   The clients became "targets".  And in the end, the Plaintiffs, like so many other clients, became "victims" of corporate greed.

139.   The receipt of fees and pecuniary gain from those fees was the primary motive for the Defendants' and the Other Participants' conduct; the provision of professional services to clients was merely an incidental byproduct of, not a motivating

68

factor for, the Defendants' conduct alleged herein.  Further, the Defendants' Arrangement gave each of the participating Defendants and the Other Participants a significant pecuniary interest in the advice and professional services they would render.

140.    The Defendants and the Other Participants had a financial, business and property interest in inducing the Plaintiffs, as well as other clients, to enter into the Captive Insurance Strategies, and to do so, fraudulently promised, opined and assured that the Captive Insurance would legally reduce Plaintiffs' income taxes while providing *bona fide* insurance.

141.    The Defendants and the Other Participants entered into the Defendants' Arrangement, whereby they agreed and had a meeting of the minds that they would solicit each other's clients and cooperate to execute the Captive Insurance Strategies.

142.    Here, the Defendants and the Other Participants conspired to perpetrate a fraud on Plaintiffs, each with knowledge of the object of the conspiracy.  Each of the Defendants and the Other Participants had particular roles and responsibilities in connection with the design, marketing, sale, and implementation of the respective Captive Insurance Strategies.  In addition, the Defendants and the Other Participants authorized, ratified and/or affirmed the fraudulent misrepresentations and/or omissions made by each of the Defendants' and the Other Participants.  Each Defendant committed at least one overt act in furtherance of the unlawful conspiracy.

## V.

## CLASS ALLEGATIONS

143.    Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(b)(l)(A), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, as a class action

69

on behalf of themselves and the nationwide class of all persons (the "Class Members," the "alleged class" or the "Class") defined below against Defendants Clark, Clark & Gentry, Hiller, Fennemore, Rosenbach, ACR, RMS, Heritor, and Pan American (collectively the "Class Defendants"):

> All Persons who, from January 1, 2005 to the present, inclusive were assessed back-taxes, penalties, and/or interest by the Internal Revenue Service as a result of their involvement, either directly or indirectly through an ownership stake in another entity, in a Captive Insurance Strategy designed, marketed, sold, implemented or managed by Clark and/or Clark & Gentry or its predecessors. Excluded from the Class are: Defendants; Defendants' parents, subsidiaries, and affiliates; anyone receiving referral fees for the plans; and federal governmental entities.

144.  Plaintiffs believe that the Class consists of hundreds if not thousands of Class Members geographically dispersed throughout the United States such that joinder is impracticable. These Class Members may be identified from information and records maintained by the Class Defendants, or third parties.

145.  The Individual Plaintiffs and the Class Members each and all have tangible and legally protectable interests at stake in this action.

146.  The claims of the Individual Plaintiffs and the Class Members have a common origin and share a common basis. The claims of all Class Members originate from the same fraudulent transaction predicated by the Class Defendants.

147.  The Individual Plaintiffs state a claim for which relief can be granted that is typical of the claims of the Class Members. Thus, the class representatives have been the victims of the same illegal acts as each member of the class.

148.   If brought and prosecuted individually, each of the Class Members would necessarily be required to prove the instant claim upon the same material and substantive facts, upon the same remedial theories and would be seeking the same relief.

149.   The claims and remedial theories pursued by the Individual Plaintiffs are sufficiently aligned with the interests of the Class Members to ensure that the universal claims of the alleged class will be prosecuted with diligence and care by the Plaintiffs as representatives of the Class.

150.   There are questions of law and fact common to the alleged class. Such common questions include, *inter alia*:

   a.   Whether the Class Defendants and the Other Participants defrauded Plaintiffs  by advising and recommending, often in writing, that Plaintiffs and members of the Class engage in illegal and abusive tax shelters, the Captive Insurance Strategies;

   b.   Whether the Class Defendants and the Other Participants defrauded Plaintiffs  by advising Plaintiffs and members of the Class, often in writing, that the premiums, fees, and expenses of the Captive Insurance Strategies were deductible under the Internal Revenue Code;

   c.   Whether the Class Defendants and the Other Participants defrauded Plaintiffs  by advising Plaintiffs and members of the Class, often in writing, that the captive insurance companies would comply with Section 831(b) of the Internal Revenue Code and therefore would not pay taxes on the premiums they received;

   d.   Whether the Class Defendants and the Other Participants defrauded Plaintiffs  by advising Plaintiffs and members of the Class, often in writing, that the captive insurance companies that the Class Defendants formed, operated, and managed in connection with the Captive Insurance Strategies would be operated as normal insurance companies and that the products they were purchasing would be considered as insurance under the Internal Revenue Code;

   e.   Whether the Class Defendants and the Other Participants defrauded Plaintiffs  by advising Plaintiffs and members of the Class, often in

writing, that circular cash flows between them and the captive insurance companies the Class Defendants formed, operated, and managed in connection with the Captive Insurance Strategies complied with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

f.  Whether the Class Defendants and the Other Participants defrauded Plaintiffs  by advising Plaintiffs and members of the Class, often in writing, that the Captive Insurance Strategies the Class Defendants and the Other Participants advised Plaintiffs and members of the Class to execute complied with the applicable tax and insurance laws, rules, regulations, common law doctrines, and published court decisions;

g.  Whether the Class Defendants and the Other Participants defrauded Plaintiffs and members of the Class by advising Plaintiffs and members of the Class, often in writing, that the premium prices of the captive insurance companies were calculated through actuarially sound methods;

h.  Whether the Class Defendants and the Other Participants conspired and/or aided and abetted each other in furtherance of the unlawful acts alleged herein and incorporated by reference;

i.  Whether the Class Defendants and the Other Participants engaged in a pattern of racketeering activity in violation of RICO and/or Arizona's RICO statute ("Arizona RICO") codified at A.R.S. §13-2301, *et seq.* based on the unlawful acts alleged herein and incorporated by reference;

j.  Whether the Class Defendants' and the Other Participants' overt and/or predicate acts in furtherance of the conspiracy and/or aiding and abetting, based on the unlawful acts alleged herein and incorporated by reference, resulted in or proximately caused and causes injury to the Plaintiffs' and Class Members' business or property or irreparably harmed and harms the Plaintiffs and the alleged class and if so, the appropriate relief to which they are entitled;

k.  Whether the Class Defendants' acts, practices, and representations, based on the unlawful acts alleged herein and incorporated by reference, constitute violations of applicable law for which Plaintiffs and the Class Members are entitled to recover restitution or damages or for which disgorgement of ill-gotten monies is appropriate;

l.  Whether  the Class Defendants' actions, based on the unlawful acts alleged herein and incorporated by reference, constitute mail and/or wire fraud; and

m. Whether the Class Defendants have been unjustly enriched through the unlawful acts alleged herein and incorporated by reference.

151.   Adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other Class Members who are not parties to the action or could substantially impair or impede their ability to protect their interests.

152.   The Class Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate final relief with respect to the Class as a whole. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the alleged Class which would establish incompatible standards of conduct for the party opposing the Class. Such incompatible standards, inconsistent or varying adjudications on what, of necessity, would be the same essential facts, proof and legal theories, would create and allow to exist inconsistent and incompatible rights within the Class. Further, the failure to permit this cause to proceed as a class action under Rule 23(b)(1)(A) would be contrary to the beneficial and salutary public policy of judicial economy in avoiding a multiplicity of similar actions. The Plaintiffs also allege that questions of law and fact applicable to the Class predominate over individual questions and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Therefore, certification is appropriate under Rule

73

23(b)(3). Failure to permit this action to proceed under Rule 23 would be contrary to the public policy encouraging the economies of attorney and litigant time and resources.

153.    The named Plaintiffs allege that they are willing and prepared to serve the Court and proposed Class in a representative capacity with all of the obligations and duties material thereto.

154.    The self-interests of the named Class representatives are co-extensive with and not antagonistic to those of the absent Class Members. The proposed representatives will undertake to well and truly protect the interests of the absent Class Members.

155.    The named Plaintiffs have engaged the services of counsel indicated below. Plaintiffs' counsel are experienced in complex class litigation involving *inter alia* tax and insurance issues and will adequately prosecute this action and will assert, protect, and otherwise represent well the named Class representatives and absent Class Members.

156.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. There will be no difficulty in the management of this action as a class action.

157.    The Plaintiffs will fairly and adequately protect the interest of the Class and have no interests adverse to or which directly and irrevocably conflict with the interests of other Class Members.

## VI.

## ALLEGATIONS RELATING TO RICO AND ARIZONA RICO

158.    Plaintiffs are "persons" within the meaning of 18 U.S.C. § 1964(c) and A.R.S. § 12-2314.04(A).

74

159.   At all times relevant hereto, each of Plaintiffs and the Defendants were and are "persons" within the meaning of 18 U.S.C. § 1961(3).

**A.     Enterprise**

160.   Plaintiffs are "persons" within the meaning of 18 U.S.C. §1964(c) and A.R.S. §13-2314.04(A).

161.   At all times relevant hereto, each of Plaintiffs and the Defendants were and are "persons" within the meaning of 18 U.S.C. §1961(3).

**A.     Enterprise**

162.   An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

163.   In this case, the enterprise ("Enterprise") for RICO and Arizona RICO purposes consists of (1) the Defendants; (2) the Other Participants; and (3) all other persons and entities that solicited persons to participate in Clark and Clark & Gentry's Captive Insurance Strategies Arrangement (sometimes referred to as the "Arrangement") for the alleged purpose of generating and sharing fees and commissions generated from the Captive Insurance Strategies and alleged tax liability reduction it purported to provide.

164.   These individuals and entities individually and through their agents represented to their victims that the Arrangement qualified as *bona fide* arrangements under IRC §831(b) and could support deductions under 26 USC § 162(a) and Sec. 1.162-1(a), Income Tax Regs.  In reality, the Arrangement did not qualify under these Code sections and could not support the promised tax benefits.  The plan was devised solely to facilitate the sale of insurance policies and the provision of administrative, investment

and professional services that would generate significant fees and commissions to the Defendants. The Defendants and the Other Participants have made millions of dollars orchestrating the Arrangement.

165.   Defendants sought out as clients those persons, like Plaintiffs and other Class Members, that had high taxable income, owned businesses, and had significant cash flow available to fund such policies; these clients were then "sold on" Defendants' design of how to promote, sell, structure, and capitalize on the Arrangement for the main purposes of providing significant revenue for Defendants. There was no lawful criteria followed by the Defendants in establishing Plaintiffs' insurable risk, their limits of coverage, or what insurable risks could not be purchased in the normal insurance marketplace at competitive prices. The intent by the Defendants was to unlawfully promote and sell the Arrangement for huge and unlawful fees and premiums.

166.   Captive insurance structures are highly sophisticated and complicated with complex tax and other regulatory requirements. As such, captive insurance entails enormous operational challenges including, but not limited to (i) properly insuring real business risk and then following the requirements for sharing and shifting risk via reinsurance, (ii) using the reserve funds maintained under the policy within guidelines, and (iii) structuring reinvestment vehicles to properly manage and protect those assets so that if and when claims are made, indemnity payments can be issued for properly documented and timely claims. None of these characteristics were present in the Captive Insurance Strategies that the Defendants convinced the Plaintiffs and the Class members to execute.

167.    The Defendants and the Other Participants engaged in a common plan, transaction and course of conduct described herein in connection with the design, promotion and sale of Captive Insurance Strategies Arrangements, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business that operated as a fraud upon the Plaintiffs and the Class, the primary purpose and effect of which was to generate huge and unlawful fees and commissions by fraudulently selling a series of transactions under the guise of selling "insurance" as part of the defective tax products at issue in this case—the Captive Insurance Strategies.

168.    While the Defendants and the Other Participants participated in the Enterprise and were a part of it, the Defendants and the Other Participants also had an existence separate and distinct from the Enterprise.

169.    Defendants and the Other Participants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

170.    Defendants and the Other Participants' control and participation in the Enterprise were necessary for the successful operation of Defendants' scheme. The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

**B.    Operation of the RICO Enterprise**

171.    Microcaptive insurance plans caught the attention of unscrupulous professionals for three reasons: (1) such plans allegedly could be funded with tax

deductible contributions[13]; (2) the rules involved were highly technical and thus unlikely to be understood by laypersons, like the Plaintiffs and members of the Class, who were thus also unlikely to question the advice being offered by alleged experts in the area; and (3) an unlimited number of "insureds" could participate.

172.    Tax deductible captive insurance arrangements are allowed for businesses that meet certain requirements, such as those that have atypical insurance needs that are very costly or non-existent in the commercial insurance marketplace.  However, captive insurance is not tax deductible in every case simply because the insured generates revenue and forms a captive.  Promoters of Captive Insurance Strategies can mimic legitimate tax deductible captive insurance arrangements by creating a voluminous paper trail and referencing tax code sections that convince their clients that the transactions are valid.  This "illusion of validity" is what the Defendants fraudulently used to persuade and mislead the Plaintiffs to agree to participate in Captive Insurance Strategies: Defendants described a simple scheme, saying the right things to get the structure in place, and minimizing the actual operations of the Captive Insurance Strategy.

173.    The Defendants in this case (as well as the Other Participants) had to make premiums appear as a tax-deductible expense to the "participants" and as a microcaptive insurance arrangement plan to the IRS. Defendants also had to constantly forage for clients who could pay thousands of dollars annually for several years into such unlawful arrangements.

---

[13] The Defendants and Other Participants represented to Plaintiffs and members of the Class that they would receive an ordinary income deduction for the premium and the premium would not be taxed at the captive insurance level; any subsequent distributions of these funds supposedly would be taxed at capital gains rates as a qualified dividend.

174.    Each of these participants were vital to the implementation of the Captive Insurance Strategies, played an important role in the success of the Enterprise, and either controlled the Enterprise or knowingly implemented the decisions of others in the Enterprise:

a.  <u>Clark and Clark & Gentry.</u> Clark and her law firm Clark & Gentry were responsible for creating, designing, establishing, and managing the microcaptive insurance arrangements.   Through a referral network of professional advisors, including Hiller, McEntee, and others, Clark and/or Clark & Gentry systematically identified clients like Plaintiffs and other members of the Class, who they then induced into entering into captive insurance arrangements.   To induce clients to enter into these transactions, Clark and Clark & Gentry commissioned actuarial studies using RMS, ACR, Rosenbach and other firms and individuals to produce the actual studies.   These studies were designed to create and did create a veneer of legitimacy for the Captive Insurance Strategies.   In addition, Clark and/or Clark & Gentry made numerous false and misleading misrepresentations and omissions in letters, emails, pitch materials, invoices, applications, and through other communications to induce clients to enter into the Captive Insurance Strategies. These misrepresentations and omissions include those described in paragraphs 96-108, *supra*.   Once Clark and/or Clark & Gentry secured a client, it used a network of employees, affiliated entities, and other individuals and entities, including other Defendants and the Other Participants, to implement the Captive Insurance Strategies. These efforts included, among other things, retaining RMS, ACR, Rosenbach and others to prepare the actuarial reports, filing regulatory materials on behalf of the captive, retaining Heritor to manage the captive, and advising Plaintiffs on which policies to implement, premium pricing, processing claims, and tax issues.

b.  <u>McEntee and McEntee & Associates.</u>   Craig McEntee and McEntee & Associates, P.C., had been the Avrahamis' trusted CPAs for about twenty-five years prior to implementation of the Captive Insurance Strategies.   McEntee & Associates, was a full-service accounting firm employing six full-time employees, primarily dealing with tax issues and the preparation of tax returns. McEntee & Associates, also provided bookkeeping services. McEntee recommended that the Avrahamis consult with Hiller for expertise in tax law and Clark for her expertise in captive insurance.  McEntee, McEntee & Associates,

79

and Hiller were the front-line promoters of the Plan.  McEntee and McEntee & Associates prepared and signed the tax returns for Plaintiffs in connection with the Captive Insurance Strategies and advised Plaintiffs to sign and file these returns.

c.  <u>Hiller and Fennemore & Craig</u>. Hiller and his firm Fennemore were co-counsel to Clark in establishing the Captive Insurance Strategies. In this capacity, Hiller was instrumental in referring the Avrahamis to Clark and working with Clark to convince the Avrahamis to enter into the Captive Insurance Strategies.  He also provided the legal "stamp of approval" for these strategies in the form of his oral legal opinion that purported to approve of the tax benefits of the microcaptive insurance arrangements.

d.  <u>RMS</u>: RMS provided a variety of actuarial services relating to feasibility studies, pricing and rate filings, and actuarial reports. Here, prior to 2009, RMS provided reports at the request of Clark and Clark & Gentry that purported to establish the actuarial *bona fides* of the Captive Insurance Strategies.  In actuality, these reports simply reverse-engineered policies and premium pricing to target the Section 831 annual premium limits for microcaptive insurance companies.  These reports contained numerous material misrepresentations and omissions, and RMS knew that the reports contained material misrepresentations and omissions.  RMS knew its reports were being used to create the false impression that captives were actuarially sound when, in fact, they were not.

e.  <u>ACR and Rosenbach</u>: Rosenbach and his firm ACR, like, RMS provided a variety of actuarial services relating to feasibility studies, pricing and rate filings, and actuarial reports.  After 2008, Rosenbach and ACR provided reports at the request of Clark and Clark & Gentry that purported to establish the actuarial *bona fides* of the Captive Insurance Strategies.  In actuality, these reports simply reverse-engineered policies and premium pricing to target the Section 831 annual premium limits for microcaptive insurance companies.  These reports contained numerous material misrepresentations and omissions, and Rosenbach and ACR knew that the reports contained material misrepresentations and omissions. Rosenbach and ACR also knew their reports were being used to create the false impression that captives were actuarially sound when, in fact, they were not.  In addition, ACR and Rosenbach were not independent.  During the timeframe at issue, many, and in some years, almost all of ACR and Rosenbach's work came from Clark.

f.  <u>Heritor</u>: Feedback, under Clark's control, retained Heritor, a St. Kitts company, to assist Feedback with general management, monitor compliance with Kittian regulations, apply for licenses, and process claims.   And from 2007 through 2015, Heritor provided these services in St. Kitts.  Heritor is owned by Robin Trevors and charged annual fees to Feedback in excess of $3000.00.  In addition to Heritor, Robin Trevors also owned the company that managed Pan American.  Heritor knew that it provided general management, compliance, licensure, and claims processing services to Plaintiffs and other Members of the Class to create the false impression that microcaptives established by Clark, like Feedback, were *bona fide* insurance companies when they were not.

g.  <u>Pan American</u>:  Pan American was incorporated in January 2009 in St. Kitts and was an insurer licensed in and regulated by the Island of Nevis. It insured risks for Plaintiffs and other members of the Class, and then reinsured a portion of those risks with individual captive insurers. Pan American did not adequately reinsure risk for the captives formed, managed, and administered by Clark.  Pan American knew that its quota-share program would not adequately reinsure risk because it lacked sufficient independent risk exposure and was undercapitalized.  Because Pan American did not offer a *bona fide* reinsurance pool for redistributing risk, the captive insurers participating in the Pan American Pool were not providing *bona fide* insurance to their insureds.  Accordingly, these captive insurers could not obtain favorable tax treatment under Section 831(b), a result that Pan American knew would follow from its failure to reinsure risk properly.   Pan American's role in the Enterprise provided a veneer of legitimacy to the Captive Insurance Strategies without offering any actual insurance benefits.

175.   There is no question that the Defendants intended to commit wire and/or mail fraud in connection with the promotion and operation of the Captive Insurance Strategies because the IRS has made it clear that any deductions for money put into such plans as premiums would be disallowed.  It is also clear that Defendants' racketeering activity in creating, designing, establishing, promoting, and vouching for the Captive Insurance Strategies involved numerous false and misleading misrepresentations and omissions that amount to a scheme or artifice to defraud.

176.   Unfortunately, the "participants" (*i.e.*, the Plaintiffs and the Class) have been deemed by the IRS to have invested in an "abusive tax shelter," have been assessed back taxes, penalties, and/or interest by the IRS for the underpayment of taxes due to filing tax returns reflecting the promised tax benefits of the Captive Insurance Strategies Arrangement, and have incurred substantial amounts of additional accounting and legal fees in connection with the IRS investigation of their tax returns and the Tax Court proceedings.

177.   Taxpayers like the Plaintiffs, who were fully reliant on the advice and representations of the credentialed professionals like Defendants that promoted, sold, structured, and established the Captive Insurance Strategies Arrangement, were "collateral damage" of the Defendants' scheme to extract fees and commissions. Plaintiffs were fully reliant on the credentialed professionals like Defendants who promoted, sold, and structured the Captive Insurance Strategies Arrangements and trusted they were being advised, counseled and directed by those professionals who said they were experts or highly experienced with these types of structures.  Defendants received large amounts of fees, commissions and had access to pooled funds for tax free loans and potential personal use/gain while at all times assuring Plaintiffs they were in full compliance with the applicable IRS guidelines and the compliance and operational requirements that were applicable.

**C.   Predicate Acts**

178.   With respect to the activities alleged herein, the Defendants and Other Participants acted at all times with malice toward the Plaintiffs and the Class, intending to

engage in the conduct complained of for the benefit of Defendants and with knowledge that such conduct was unlawful. Such conduct was done with actionable wantonness and reckless disregard for the rights of Plaintiffs and the Class, as well as the laws to which the Defendants are subject, the same amounting to actionable wantonness.

179.   With respect to the activities alleged herein, each Defendant and Other Participant agreed to the operation of the transaction or artifice to deprive Plaintiffs and the Class of property interests. In furtherance of these agreements, each Defendant also agreed to interfere with, obstruct, delay or affect interstate commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants were not entitled.

180.   With respect to the overt acts and activities alleged herein, each Defendant conspired with each other, the Other Participants, and with others not named as Defendants in this Complaint, to violate 18 U.S.C. §1962(c) and A.R.S. §§13-2312, all in violation of 18 U.S.C. §1962(d) and Arizona law. Each Defendant also agreed and conspired with each other Defendant to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants were not entitled.

181.   The numerous predicate acts of wire and/or mail fraud in addition to other fraudulent acts, are part of separate fraudulent transactions by Defendants designed to defraud the Individual Plaintiffs and the Class of money and property interests under false pretenses. As victims of these unlawful patterns of illegal activity, Plaintiffs and members of the Class have and continue to suffer losses as a result of these activities.

The acts which caused injuries to the Plaintiffs and members of the Class were performed for financial gain.

182.   In carrying out the overt acts and fraudulent transactions described above, the Defendants engaged in, *inter alia*, conduct in violation of federal laws, including 18 U.S.C. §§1343-1346, and 18 U.S.C. §1961 *et seq*.  They also violated A.R.S. §§13-2312 and 13-2301 *et seq*.

183.   Section 1961(1) of RICO provides that "racketeering activity" means any act indictable under any of the following provisions of Title 18, United States Code: §1343 (relating to wire fraud) and §1346 (relating to scheme or artifice to defraud).

184.   Section 13-2301(D)(4) of the Arizona Revised Statutes provides that "[r]acketeering means any act, including any preparatory or completed offense, that is chargeable or indictable under the laws of the state or country in which the act occurred and, if the act occurred in a state or country other than this state, that would be chargeable or indictable under the laws of this state if the act had occurred in this state." Racketeering is further defined to include only those acts that are punishable by imprisonment of one year or more that involve one of 27 categories of offenses.  Among these offenses are those involving "[a] scheme or artifice to defraud."

**D.     Violations of 18 U.S.C. § 1343 and A.R.S. §13-2301(D)(4)**

185.   Plaintiffs repeat and reallege each and every prior allegation in this Complaint as if fully set forth herein.

186.   For the purpose of executing and/or attempting to execute their transaction to defraud and to obtain money by means of false pretenses, representations or promises, the Defendants and their co-conspirators, in violation of 18 U.S.C. §1343, transmitted

and received by wire and/or mail matter and things therefrom including but not limited to contracts, instructions, correspondence, funds, and other transmittals.

187.    Defendants' violations of 18 U.S.C. §1343 are too numerous to list exhaustively. However, the acts described in paragraphs 96-108, *supra,* provide, by way of illustration but not limitation, representative examples of Defendants' 18 U.S.C. §1343 violations.

188.    Each of the invoices, letters, emails, applications, and tax forms that Defendants sent by wire and/or mail to Plaintiffs and members of the Class served at least two roles in the Enterprise.  First, these documents, standing alone, were fraudulent. Defendants knew the tax treatment contemplated by their communications was inaccurate.  Defendants also knew that they were not providing actual insurance to Plaintiffs and members of the Class, contrary to representations in the engagement letters and on the face of the invoices.  Second, in addition to being fraudulent standing alone, these documents were used to advance the fraudulent scheme that Defendants perpetrated on Plaintiffs and the Class.

189.    Defendants' efforts in connection with executing or attempting to execute their transactions to defraud and to obtain money by means of false pretenses, representations or promises, including without limitation acts done in violation of 18 U.S.C. § 1343 also violated A.R.S. §13-2301(D)(4) because these acts amounted to a scheme or artifice to defraud for financial gain.

190.    In those matters and things sent or delivered by wire, through other interstate electronic media, and/or by mail Defendants and their co-conspirators falsely

and fraudulently misrepresented and fraudulently suppressed material facts from Plaintiffs and the Class as described above, in violation of 18 U.S.C. § 1343. These acts, in addition to false and fraudulent misrepresentations communicated outside the interstate wire and mail systems, also violated A.R.S. §13-2301(D)(4). Defendants' fraudulent statements and omissions include but are not limited to the following:

(1)    Orchestrating the design, development, implementation, operation, and management of the Captive Insurance Strategies;

(2)    Advising Plaintiffs and the members of the Class to engage in the Captive Insurance Strategies;

(3)    Advising and recommending that Plaintiffs and members of the Class to engage in illegal and abusive tax shelters, the Captive Insurance Strategies;

(4)    Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies were illegal and abusive tax shelters;

(5)    Failing to disclose existing published authority that indicated that the purported tax of the Captive Insurance Strategies were improper and not allowable for federal income tax purposes;

(6)    Advising Plaintiffs and members of the Class that the Captive Insurance Strategies the Defendants and the Other Participants advised Plaintiffs and members of the Class to execute complied with the applicable tax and insurance laws, rules, regulations, common law doctrines, and published court decisions;

(7)    Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies the Defendants and the Other Participants advised Plaintiffs and members of the Class to execute did not comply with the applicable tax and insurance laws, rules, regulations, common law doctrines, and published court decisions;

(8)    Failing to advise Plaintiffs and members of the Class that various common law doctrines, including the economic

substance, business purpose, step transaction, and sham transaction doctrines, would disallow the tax benefits of the Captive Insurance Strategies;

(9)     Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies lacked the required business purpose and economic substance;

(10)    Advising Plaintiffs and the members of the Class that the policies issued by their Captive Insurance Strategies constituted insurance and therefore created lawful tax benefits for the Captive Insurance Company and the insured;

(11)    Recommending, instructing, and advising Plaintiffs and members of the Class that they would receive substantial tax advantages by entering into policies with the captive insurer as part of the Captive Insurance Strategies;

(12)    Advising Plaintiffs and members of the Class that the Captive Insurance Companies complied with Section 831(b) of the Internal Revenue Code and therefore the premiums paid to the captive insurance companies would be tax deductible;

(13)    Failing to advise Plaintiffs and members of the Class that the Captive Insurance Companies did not comply with Section 831(b) of the Internal Revenue Code and therefore the premiums paid to the captive insurance companies would not be tax deductible;

(14)    Advising Plaintiffs and members of the Class that the captive insurance companies complied with Section 831(b) of the Internal Revenue Code and therefore the Captive Insurance Company would not pay taxes on the premiums received;

(15)    Failing to advise Plaintiffs and members of the Class that the captive insurance companies would not comply with Section 831(b) of the Internal Revenue Code and therefore the Captive Insurance Company would pay taxes on the premiums received;

(16)    Advising Plaintiffs and members of the Class that the captive insurance companies that Defendants formed, operated, and managed in connection with the Captive Insurance Strategies would be operated as normal insurance companies;

(17)    Failing to advise Plaintiffs and members of the Class that the captive insurance companies that Defendants formed, operated, and merged and in connection with the Captive Insurance Strategies would not be operated as normal insurance companies;

(18)    Advising Plaintiffs and members of the Class that the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies would fall within a safe harbor provision of Section 831(b) of the Internal Revenue Code;

(19)    Failing to advise Plaintiffs and members of the Class that the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies would not fall within any safe harbor provision of Section 831(b) of the Internal Revenue Code;

(20)    Advising Plaintiffs and members of the Class that the Captive Insurance Strategies involved the purchase of *bona fide* insurance;

(21)    Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies did not involve the purchase of *bona fide* insurance;

(22)    Advising Plaintiffs and the members of the Class that the Captive Insurance Strategies provided insurance coverages that were highly rated by the insurance industry;

(23)    Failing to advise Plaintiffs and the members of the Class that the Captive Insurance Strategies provided insurance coverages that were not highly rated by the insurance industry;

(24)    Advising Plaintiffs and members of the Class that the Captive Insurance Strategies covered gaps in commercial coverage for material risks facing Captive Insurance Strategy clients;

(25)    Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies did not cover gaps in commercial coverage for material risks facing Captive Insurance Strategy clients;

(26)   Failing to advise Plaintiffs and members of the Class that the insurance policies used to implement the Captive Insurance Strategies were significantly overpriced;

(27)   Advising, instructing, and assisting Plaintiffs and members of the Class in the purchase and execution of the captive insurance policies;

(28)   Advising Plaintiffs and members of the Class that the risks covered by the Captive Insurance Strategies were insurable risks;

(29)   Failing to advise Plaintiffs and members of the Class that the risks covered by the Captive Insurance Strategies were not insurable risks;

(30)   Advising Plaintiffs and members of the Class that the premium prices of the captive insurance companies were calculated through actuarially sound methods;

(31)   Failing to advise Plaintiffs and members of the Class that their premiums for the insurance policies were not in fact arrived at by actuarially sound calculations;

(32)   Advising Plaintiffs and members of the Class that the pooling arrangements of the Captive Insurance Strategies through Pan American complied with all risk shifting and risk distribution requirements;

(33)   Failing to advise Plaintiffs and members of the Class that the pooling arrangements of the Captive Insurance Strategies through Pan American did not comply with all risk shifting and risk distribution requirements;

(34)   Advising Plaintiffs and members of the Class that loans and distributions from the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies were proper, legal, and complied with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(35)   Failing to advise Plaintiffs and members of the Class that loans and distributions from the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies were not proper and did

not comply with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(36)     Advising Plaintiffs and members of the Class that circular cash flows between the insured and the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies were proper and complied with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(37)     Failing to advise Plaintiffs and members of the Class that circular cash flows between the insured and the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies were not proper and did not comply with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(38)     Advising Plaintiffs and the members of the Class to sign and file tax returns that reported the tax deductions and benefits of the Captive Insurance Strategy in reliance on Defendants' advice, representations, recommendations, instructions, and opinions, which Defendants knew or should have known the IRS and a tax court would disallow as improper and illegal;

(39)     Advising, instructing, and assisting in the preparation of the tax return for Plaintiffs and members of the Class, which reported the premiums, fees, and expenses generated in connection with the Captive Insurance Strategies as deductions of income;

(40)     Failing to advise Plaintiffs and members of the Class not to report the premiums, fees, and expenses generated in connection with the Captive Insurance Strategies as deductions on the tax returns of Plaintiffs and members of the Class;

(41)     Advising Plaintiffs and members of the Class that their tax returns, which utilized the reduction in taxes generated by the Captive Insurance Strategies, were prepared pursuant to and/or complied with IRS guidelines and established legal authorities;

(42)     Failing to advise Plaintiffs and members of the Class that their tax returns, which utilized the reduction in taxes

generated by the Captive Insurance Strategies, were not prepared pursuant to and/or did not comply with IRS guidelines and established legal authorities;

(43) Failing to disclose to Plaintiffs and members of the Class that if they filed tax returns that deducted the premiums, fees, and expenses of the Captive Insurance Strategies they would be liable for taxes, penalties and/or interest if audited;

(44) Preparing the tax returns for the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies that reported the tax benefits related to the premiums received and advising Plaintiffs and members of the Class to sign, file, and rely upon these tax returns;

(45) Advising Plaintiffs and members of the Class to report the premiums, fees, and expenses of the Captive Insurance Strategies as deductions on their tax returns;

(46) Advising Plaintiffs and members of the Class that the Captive Insurance Strategies would be upheld as a legal micro-captive insurance company if audited;

(47) Failing to Advise Plaintiffs and members of the Class that the Captive Insurance Strategies would not be upheld as a legal micro-captive insurance strategy if audited;

(48) Advising Plaintiffs and members of the Class that the tax benefits of the Captive Insurance Strategies would be allowed if audited;

(49) Failing to advise Plaintiffs and members of the Class that the tax benefits of the Captive Insurance Strategies would be disallowed if audited;

(50) Advising Plaintiffs and members of the Class, both before and after the IRS audit, that the Captive Insurance Strategies they executed were different and distinguishable from other Captive Insurance Strategies that the IRS and/or Tax Court had disallowed;

(51) Failing to advise Plaintiffs and members of the Class, both before and after the IRS audit, that the Captive Insurance Strategies they executed were not different and

distinguishable from other Captive Insurance Strategies that the IRS and/or Tax Court had disallowed;

(52)   Advising Plaintiffs and members of the Class that they should challenge the IRS in both audits and Tax Court proceedings because Plaintiffs and members of the Class would prevail and the Captive Insurance Strategies would be allowed;

(53)   Failing to advise Plaintiffs and members of the Class that they should not challenge the IRS in both audit and Tax Court proceedings because Plaintiffs and members of the Class would not prevail and the Captive Insurance Strategies would be disallowed;

(54)   Advising Plaintiffs and members of the Class that the management of the investments of each individual captive insurance company would comply with the tax code and prevailing insurance industry standards;

(55)   Failing to advise Plaintiffs and members of the Class that the management of the investments of each individual captive insurance company would not comply with the tax code and prevailing insurance industry standards;

(56)   Making and endorsing the statements and representations contained in the Defendants' and the Other Participants' oral and written advice, instructions, and recommendations;

(57)   Failing to advise Plaintiffs and members of the Class that each of the Defendants and the Other Participants were not "independent" of one another and in fact were involved in a conspiracy to design, market, sell, and implement the Captive Insurance Strategies; and

(58)   Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Plaintiffs and members of the Class, orally or in writing, regarding the propriety of the Captive Insurance Strategies.

191.   The predicate acts, including the predicate acts of wire fraud, are continuing. The Defendants, and the other wrongdoers, on their own and as part of a common fraudulent scheme and conspiracy, defrauded Plaintiffs as set out above.

92

192.    The Defendants and their co-conspirators intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Plaintiffs and the Class, for the purpose of deceiving them and thereby obtaining financial gain. The Defendants either knew or recklessly disregarded that the misrepresentations and omissions described above were material.  Plaintiffs and the Class were injured as a result of the misrepresentations and omissions in carrying out the transactions and subsequently filing tax returns based on the fraudulent and false misrepresentations and omissions from Defendants and their co-conspirators.

193.    The Defendants and their co-conspirators made continual use of wire transmissions, in addition to communications made outside the interstate wire systems, to effectuate their fraudulent scheme.  In addition to using in person, telephonic, and other means of communication to make fraudulent statements, the Defendants and their co-conspirators transmitted numerous specific fraudulent statements to Plaintiffs and the Class through the mail, by fax, and/or by email.

194.    The Defendants and their co-conspirators intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Plaintiffs and the Class, for the purpose of deceiving them and thereby obtaining financial gain. The Defendants and their co-conspirators either knew or recklessly disregarded that the misrepresentations and omissions described above were material. Plaintiffs and the Class were injured as a result of the misrepresentations and omissions in carrying out the transactions and subsequently filing tax returns based on the

fraudulent and false misrepresentations and omissions from Defendants and their co-conspirators.

195.   As set forth above, there are numerous specific examples of the predicate acts of fraud, including wire fraud, committed by Defendants pursuant to their transactions to defraud Plaintiffs.

196.   Plaintiffs have therefore been injured in their business or property as a result of the Defendants' overt acts and racketeering activities.

**E.   Pattern of Racketeering Activity**

197.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

198.   As set forth above, the Defendants have engaged in a "pattern of racketeering activity," as defined in §1961(5) of RICO and A.R.S. §13-2314.04(T)(3), by committing and/or conspiring to commit at least two such acts of racketeering activity, as described above, within the past ten years.  Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including Plaintiffs and the Class.

199.   The multiple acts of racketeering activity committed and/or conspired to by Defendants, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5) and A.R.S. §13-2314.04(T)(3). Plaintiffs allege that the course of conduct engaged in by the Defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern

94

of racketeering activity, as that term is defined in 18 U.S.C. §1961(5) and A.R.S. §13-2314.04(T)(3).  Plaintiffs can show the relatedness prong because the predicate acts have "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise."  All predicate acts had the same purpose of utilizing the Enterprise to misrepresent the nature of the transactions underlying the Captive Insurance Strategies Arrangement so that the Defendants could defraud Plaintiffs.  Plaintiffs allege that the continuity of the pattern of racketeering activity is "closed-ended" inasmuch as a series of related predicate offenses extended since at least 2005 (a substantial period of time).  Moreover, the continuity of the pattern of racketeering can also be established under "open-ended continuity" as the predicate offenses are part of the Enterprise's regular way of doing business, and the predicates are attributed to Defendants' operations as part of a long-term association that existed for criminal purposes.  Further, the last act of racketeering activity that is alleged as the basis of Plaintiffs' claims occurred within four years of a prior act of racketeering.

200.   Plaintiffs and the Class therefore have been injured in their business or property as a result of Defendants' overt acts and racketeering activities as described above and throughout this Complaint.

## VII.

**PLAINTIFFS' CLAIMS WERE TIMELY FILED OR, ALTERNATIVELY THE DISCOVERY RULE AND EQUITABLE TOLLING DEFERRED <u>ACCRUAL OF STATUTES OF LIMITATIONS AS TO ALL DEFENDANTS</u>**

201.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

202.   The causes of action asserted by Plaintiffs against Defendants herein are timely filed because Plaintiffs' claims first accrued within the applicable limitation period for each claim.

203.   In the alternative, the causes of action asserted by Plaintiffs against Defendants herein are timely filed as the discovery rule and/or equitable tolling deferred accrual of the respective statutes of limitation for such causes of action.

204.   Plaintiffs did not and could not discover the wrongful acts of the Defendants or the injuries caused by the wrongful acts of the Defendants alleged herein until, at the earliest, August 21, 2017, the date that the tax court issued its opinion finding that the Captive Insurance Strategies did not comply with the Tax Code.

205.   Prior to and up until the timeframe referenced in the immediately preceding paragraphs, Defendants continued to advise Plaintiffs orally and in writing that the Captive Insurance Strategies were completely legal and that they complied with all applicable insurance and tax laws.  Defendants further advised Plaintiffs orally and in writing that Plaintiffs and members of the Class should challenge the IRS's determinations and file cases in Tax Court if necessary (and, as noted earlier, even tried to convince Plaintiffs to continue to litigate this matter on an appeal of the Opinion).  Defendants further advised Plaintiffs and the members of the Class that they would win in Tax Court because the Captive Insurance Strategies were completely legal and in compliance with all applicable tax laws, rules, and common law doctrines.  These representations were wrongful and false and concealed material facts relating to Defendants' wrongdoing.  Clark and Clark & Gentry even advised Plaintiffs and

members of the Class that they would work closely with them throughout the IRS audit, which gave Plaintiffs and members of the Class further confidence in Plaintiffs' misrepresentations.  In reliance on these representations, Plaintiffs and the members of the Class were delayed and deterred from bringing their claims against Defendants earlier.  Defendants' concealment therefore prevented Plaintiffs and the members of the Class from discovery of the nature of their claims.

206.    Plaintiffs and the members of the Class exercised due diligence in pursuing discovery of their claims during the time period that commenced with Defendants rendering faulty advice and continued through Tax Court proceedings and judgment.

## VIII.

### TOLLING OF STATUES OF LIMITATIONS AS TO ALL DEFENDANTS DUE TO FRAUDULENT CONCEALMENT

207.    Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

208.    The causes of action asserted by Plaintiffs, and on behalf of the Class, against Defendants are timely filed as Defendants and their co-conspirators fraudulently concealed the injuries and wrongful conduct alleged herein.

209.    The Defendants and their co-conspirators had actual knowledge of the injuries and wrongful conduct alleged herein, but concealed the injuries and wrongful acts and omissions alleged herein by intentionally remaining silent and/or making misrepresentations about the injuries and their wrongful conduct despite having a duty to inform Plaintiffs of such injuries and wrongful acts and omissions.  The Defendants'

silence and misrepresentations prevented Plaintiffs from discovering their injuries and the Defendants' wrongful acts and omissions.

210.   The Defendants had a fixed purpose to conceal the wrongful conduct and injuries. Plaintiffs and the members of the Class reasonably relied on the Defendants' silence and misrepresentations to the detriment of Plaintiffs and the members of the Class.

## IX.

### TOLLING OF STATUTE OF LIMITATIONS
### AS TO THE DEFENDANTS DUE TO CONTINUOUS
### REPRESENTATION/CONTINUING TORT DOCTRINES

211.   Plaintiffs repeat, reallege, and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

212.   The causes of action asserted by Plaintiffs against the Defendants are timely filed pursuant to the Continuous Representation/Continuing Tort Doctrines.   In addition, the Defendants breached the fiduciary duties they owed to Plaintiffs and the members of the Class because, among other things, the Defendants failed to disclose the wrongful conduct and injuries alleged herein and concealed such wrongful conduct and injuries.

213.   Until the Tax Court decision, Defendants continued to advise Plaintiffs and the members of the Class, and Plaintiffs and members of the class continued to rely on Defendants' advice in challenging the IRS's determination in the Tax Court proceeding discussed herein, and continued to believe they could and should rely on their advice.

214.   Defendants also knowingly circulated purportedly independent actuarial reports that were false.

# X.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF RICO 18 U.S.C. §1962(c)

215.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

216.   Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

217.   Plaintiffs incorporate, as though fully set out herein, their allegations regarding Enterprise.

218.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

219.   The Defendants, who are associated with and are part of the Enterprise, conduct and have conducted the Enterprise's affairs through a pattern of racketeering activity, as set forth in this Complaint. Through the fraudulent and wrongful conduct described in this Complaint, Defendants seek and have sought to deprive Plaintiffs and members of the Class of money and property rights. In order to successfully execute their scheme in the manner set forth in this Complaint, Defendants must have a system that allows Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allows the Defendants this access.

220.   With respect to the activities alleged herein, the Defendants have acted at all times with malice toward Plaintiffs and members of the Class in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

221.   In carrying out the overt acts and fraudulent scheme described above, the Defendants have engaged in conduct in violation of federal laws, including *inter alia* 18 U.S.C. §§ 1343 and 1346, and 18 U.S.C. §1961, *et seq.* as set forth more fully above.

222.   Therefore, Defendants have each engaged in "racketeering activity" which is defined in §1961(1) of RICO to mean "any act which is indictable under any of the following provisions of 18 U.S.C. §1343 (relating to wire fraud) ...."

223.   As a proximate result of Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiffs and members of the Class have been injured in their business or property as described above.

## COUNT II
## VIOLATIONS OF RICO 18 U.S.C. §1962(d)
## BY CONSPIRING TO VIOLATE 18 U.S.C. §1962(c)

224.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

225.   This claim for relief arises under 18 U.S.C. §1964(a) of RICO and seeks relief from the Defendants' activities described herein for violations of 18 U.S.C. §1962(d) for their conspiracy to violate 18 U.S.C. §1962(c).

226.   Plaintiffs incorporate, as if fully set forth herein, their allegations regarding the Enterprise.

227.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

228.   Absent Defendants' conspiracy and joint efforts, Defendants' scheme would not be successful. Acting jointly, Defendants have and have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

229.   Defendants have also violated §1962(d) by conspiring to violate 18 U.S.C. §1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the §1962(c) Enterprise(s) described previously through a pattern of racketeering activity.

230.   Defendants, their employees, and multiple agents have been joined in the conspiracies to violate 18 U.S.C. §1962(c) in violation of §1962(d) by various third parties not named as Defendants herein, such as the Other Participants.

231.   As demonstrated in detail above, the Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy including systemic fraudulent practices designed to defraud the Plaintiffs and the Class of money and other property interests.

232.   The nature of the above described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the objective of a violation of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(c), but also they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

233.    The Defendants have engaged in the commission of and continue to commit overt acts and the following described unlawful racketeering predicate acts that have and continue to generate income or proceeds received by Defendants from such pattern of racketeering activity, including:

        a.    Multiple instances of wire fraud violations of 18 U.S.C. § 1343; and

        b.    Multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud and wire fraud.

234.    As a proximate result of Defendants' conduct as described above, Plaintiffs and the Class have been injured in their business or property as described above.

## COUNT III
## VIOLATIONS OF ARIZONA RICO A.R.S. §13-2312

235.    Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

236.    Section 12-312 of Arizona RICO provides, among other things, that "[a] person commits illegally conducting an enterprise if such person is employed by or associated with any enterprise and conducts such enterprise's affairs through racketeering or participates directly or indirectly in the conduct of any enterprise that the person knows is being conducted through racketeering."

237.    Plaintiffs incorporate, as though fully set out herein, their allegations regarding the Enterprise.

238.    Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

239.   The Defendants, who are employed by and/or associated with and a part of the Enterprise, conduct the Enterprise's affairs through racketeering, as set forth in this Complaint. Through the fraudulent and wrongful conduct described in this Complaint, Defendants sought to obtain financial gain by depriving Plaintiffs and the Class of money and property rights. In order to successfully execute their scheme in the manner set forth in this Complaint, Defendants needed a system that allowed Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allowed the Defendants this access.

240.   With respect to the activities alleged herein, the Defendants have acted at all times with malice toward Plaintiffs and the Class in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

241.   In carrying out the overt acts and fraudulent scheme described above, the Defendants have engaged in conduct in violation of Arizona state law, including *inter alia* A.R.S. §§13-2312 and 13-2301 as set forth more fully above.

242.   Therefore, Defendants have each engaged in "racketeering activity" which is defined in § 2301(D)(4) of Arizona RICO to mean "any act, including any preparatory or completed offense, that is chargeable or indictable under the laws of the state or country in which the act occurred and, if the act occurred in a state or country other than this state, that would be chargeable or indictable under the laws of this state if the act had occurred in this state . . . and the act involves," among other things, a scheme or artifice to defraud.

243.    As a proximate result of Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiffs and the Class have been injured in their business or property as described above.

## COUNT IV
## CONSPIRACY TO VIOLATE ARIZONA RICO A.R.S. §13-2312

244.    Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

245.    This claim for relief arises under A.R.S. §13-2314.04 and seeks relief from the Defendants' activities described herein as part of their conspiracy to violate A.R.S. §13-2312, which qualifies as a "preparatory" offense under the definition of racketeering activity in A.R.S. §13-2301(D)(4).

246.    Plaintiffs incorporate, as if fully set forth herein, their allegations regarding the Enterprise.

247.    Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

248.    Absent Defendants' conspiracy and joint efforts, Defendants' scheme would not be successful. Acting jointly, Defendants have and have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

249.    Defendants have also conspired to violate A.R.S. §13-2312. The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise(s) described previously through racketeering activity.

250.     Defendants, their employees, and multiple agents have been joined in the conspiracies to violate A.R.S. §13-2312 by various third parties not named as Defendants herein, such as the Other Participants.

251.     As demonstrated in detail above, the Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy including systemic fraudulent practices designed to defraud the Individual Plaintiffs and the Class of money and other property interests.

252.     The nature of the above described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the objective of conspiring to violate A.R.S. §13-2312, but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

253.     The Defendants have sought to and have engaged in the commission of and continue to commit overt acts and unlawful racketeering predicate acts that have and continue to generate income or proceeds received by Defendants from such pattern of racketeering activity, including acts that involve a scheme or artifice to defraud as set forth more fully in Section VI.C. and VI.D. *supra*.

254.     As a proximate result of Defendants' conduct as described above, Plaintiffs and the Class have been injured in their business or property as described above.

### COUNT V
### BREACH OF FIDUCIARY DUTY

255.     Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

256.   The Defendants, as the insurance, tax, legal, financial and investment advisors of Plaintiffs and the members of the Class, were fiduciaries of the Plaintiffs and the members of the Class.  Plaintiffs and the members of the Class placed their trust and confidence in Defendants, and Defendants had influence and superiority over the Plaintiffs and the members of the Class.  Thus, Defendants owed Plaintiffs and the members of the Class the duties of honesty, loyalty, care, and compliance with the applicable codes of professional responsibility.  Where possible, Defendants focused on prospective clients with preexisting relationships either with Defendants or with a professional advisor in Defendants' referral network, where they had details on each client and could use any existing relationship of trust to readily market the program and its alleged benefits.

257.   Defendants breached their fiduciary duties to Plaintiffs and the members of the Class by, among other things:

(1)   Orchestrating the design, development, implementation, operation, and management of the Captive Insurance Strategies;

(2)   Advising Plaintiffs and the members of the Class to engage in the Captive Insurance Strategies;

(3)   Advising and recommending that Plaintiffs and members of the Class to engage in illegal and abusive tax shelters, the Captive Insurance Strategies;

(4)   Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies were illegal and abusive tax shelters;

(5)   Failing to disclose existing published authority that indicated that the purported tax of the Captive Insurance Strategies were improper and not allowable for federal income tax purposes;

(6)      Advising Plaintiffs and members of the Class that the Captive Insurance Strategies the Defendants and the Other Participants advised Plaintiffs and members of the Class to execute complied with the applicable tax and insurance laws, rules, regulations, common law doctrines, and published court decisions;

(7)      Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies the Defendants and the Other Participants advised Plaintiffs and members of the Class to execute did not comply with the applicable tax and insurance laws, rules, regulations, common law doctrines, and published court decisions;

(8)      Failing to advise Plaintiffs and members of the Class that various common law doctrines, including the economic substance, business purpose, step transaction, and sham transaction doctrines, would disallow the tax benefits of the Captive Insurance Strategies;

(9)      Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies lacked the required business purpose and economic substance;

(10)      Advising Plaintiffs and the members of the Class that the policies issued by their Captive Insurance Strategies constituted insurance and therefore created lawful tax benefits for the Captive Insurance Company and the insured;

(11)      Recommending, instructing, and advising Plaintiffs and members of the Class that they would receive substantial tax advantages by entering into policies with the captive insurer as part of the Captive Insurance Strategies;

(12)      Advising Plaintiffs and members of the Class that the Captive Insurance Companies complied with Section 831(b) of the Internal Revenue Code and therefore the premiums paid to the captive insurance companies would be tax deductible;

(13)      Failing to advise Plaintiffs and members of the Class that the Captive Insurance Companies did not comply with Section 831(b) of the Internal Revenue Code and therefore the premiums paid to the captive insurance companies would not be tax deductible;

(14)     Advising Plaintiffs and members of the Class that the captive insurance companies complied with Section 831(b) of the Internal Revenue Code and therefore the Captive Insurance Company would not pay taxes on the premiums received;

(15)     Failing to advise Plaintiffs and members of the Class that the captive insurance companies would not comply with Section 831(b) of the Internal Revenue Code and therefore the Captive Insurance Company would pay taxes on the premiums received;

(16)     Advising Plaintiffs and members of the Class that the captive insurance companies that Defendants formed, operated, and managed in connection with the Captive Insurance Strategies would be operated as normal insurance companies;

(17)     Failing to advise Plaintiffs and members of the Class that the captive insurance companies that Defendants formed, operated, and merged and in connection with the Captive Insurance Strategies would not be operated as normal insurance companies;

(18)     Advising Plaintiffs and members of the Class that the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies would fall within a safe harbor provision of Section 831(b) of the Internal Revenue Code;

(19)     Failing to advise Plaintiffs and members of the Class that the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies would not fall within any safe harbor provision of Section 831(b) of the Internal Revenue Code;

(20)     Advising Plaintiffs and members of the Class that the Captive Insurance Strategies involved the purchase of *bona fide* insurance;

(21)     Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies did not involve the purchase of *bona fide* insurance;

(22)     Advising Plaintiffs and the members of the Class that the Captive Insurance Strategies provided insurance coverages that were highly rated by the insurance industry;

(23)   Failing to advise Plaintiffs and the members of the Class that the Captive Insurance Strategies provided insurance coverages that were not highly rated by the insurance industry;

(24)   Advising Plaintiffs and members of the Class that the Captive Insurance Strategies covered gaps in commercial coverage for material risks facing Captive Insurance Strategy clients;

(25)   Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies did not cover gaps in commercial coverage for material risks facing Captive Insurance Strategy clients;

(26)   Failing to advise Plaintiffs and members of the Class that the insurance policies used to implement the Captive Insurance Strategies were significantly overpriced;

(27)   Advising, instructing, and assisting Plaintiffs and members of the Class in the purchase and execution of the captive insurance policies;

(28)   Advising Plaintiffs and members of the Class that the risks covered by the Captive Insurance Strategies were insurable risks;

(29)   Failing to advise Plaintiffs and members of the Class that the risks covered by the Captive Insurance Strategies were not insurable risks;

(30)   Advising Plaintiffs and members of the Class that the premium prices of the captive insurance companies were calculated through actuarially sound methods;

(31)   Failing to advise Plaintiffs and members of the Class that their premiums for the insurance policies were not in fact arrived at by actuarially sound calculations;

(32)   Advising Plaintiffs and members of the Class that the pooling arrangements of the Captive Insurance Strategies through Pan American complied with all risk shifting and risk distribution requirements;

(33)   Failing to advise Plaintiffs and members of the Class that the pooling arrangements of the Captive Insurance Strategies

through Pan American did not comply with all risk shifting and risk distribution requirements;

(34)     Advising Plaintiffs and members of the Class that loans and distributions from the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies were proper, legal, and complied with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(35)     Failing to advise Plaintiffs and members of the Class that loans and distributions from the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies were not proper and did not comply with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(36)     Advising Plaintiffs and members of the Class that circular cash flows between the insured and the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies were proper and complied with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(37)     Failing to advise Plaintiffs and members of the Class that circular cash flows between the insured and the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies were not proper and did not comply with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(38)     Advising Plaintiffs and the members of the Class to sign and file tax returns that reported the tax deductions and benefits of the Captive Insurance Strategy in reliance on Defendants' advice, representations, recommendations, instructions, and opinions, which Defendants knew or should have known the IRS and a tax court would disallow as improper and illegal;

(39)     Advising, instructing, and assisting in the preparation of the tax return for Plaintiffs and members of the Class, which reported the premiums, fees, and expenses generated in connection with the Captive Insurance Strategies as deductions of income;

(40) Failing to advise Plaintiffs and members of the Class not to report the premiums, fees, and expenses generated in connection with the Captive Insurance Strategies as deductions on the tax returns of Plaintiffs and members of the Class;

(41) Advising Plaintiffs and members of the Class that their tax returns, which utilized the reduction in taxes generated by the Captive Insurance Strategies, were prepared pursuant to and/or complied with IRS guidelines and established legal authorities;

(42) Failing to advise Plaintiffs and members of the Class that their tax returns, which utilized the reduction in taxes generated by the Captive Insurance Strategies, were not prepared pursuant to and/or did not comply with IRS guidelines and established legal authorities;

(43) Failing to disclose to Plaintiffs and members of the Class that if they filed tax returns that deducted the premiums, fees, and expenses of the Captive Insurance Strategies they would be liable for taxes, penalties and/or interest if audited;

(44) Preparing the tax returns for the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies that reported the tax benefits related to the premiums received and advising Plaintiffs and members of the Class to sign, file, and rely upon these tax returns;

(45) Advising Plaintiffs and members of the Class to report the premiums, fees, and expenses of the Captive Insurance Strategies as deductions on their tax returns;

(46) Advising Plaintiffs and members of the Class that the Captive Insurance Strategies would be upheld as a legal micro-captive insurance company if audited;

(47) Failing to Advise Plaintiffs and members of the Class that the Captive Insurance Strategies would not be upheld as a legal micro-captive insurance strategy if audited;

(48) Advising Plaintiffs and members of the Class that the tax benefits of the Captive Insurance Strategies would be allowed if audited;

(49)     Failing to advise Plaintiffs and members of the Class that the tax benefits of the Captive Insurance Strategies would be disallowed if audited;

(50)     Advising Plaintiffs and members of the Class, both before and after the IRS audit, that the Captive Insurance Strategies they executed were different and distinguishable from other Captive Insurance Strategies that the IRS and/or Tax Court had disallowed;

(51)     Failing to advise Plaintiffs and members of the Class, both before and after the IRS audit, that the Captive Insurance Strategies they executed were not different and distinguishable from other Captive Insurance Strategies that the IRS and/or Tax Court had disallowed;

(52)     Advising Plaintiffs and members of the Class that they should challenge the IRS in both audits and Tax Court proceedings because Plaintiffs and members of the Class would prevail and the Captive Insurance Strategies would be allowed;

(53)     Failing to advise Plaintiffs and members of the Class that they should not challenge the IRS in both audit and Tax Court proceedings because Plaintiffs and members of the Class would not prevail and the Captive Insurance Strategies would be disallowed;

(54)     Advising Plaintiffs and members of the Class that the management of the investments of each individual captive insurance company would comply with the tax code and prevailing insurance industry standards;

(55)     Failing to advise Plaintiffs and members of the Class that the management of the investments of each individual captive insurance company would not comply with the tax code and prevailing insurance industry standards;

(56)     Making and endorsing the statements and representations contained in the Defendants' and the Other Participants' oral and written advice, instructions, and recommendations;

(57)     Failing to advise Plaintiffs and members of the Class that each of the Defendants and the Other Participants were not "independent" of one another and in fact were involved in a conspiracy to design, market, sell, and implement the Captive Insurance Strategies; and

112

1
2
3
4

(58)     Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Plaintiffs and members of the Class, orally or in writing, regarding the propriety of the Captive Insurance Strategies.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

258.   The Defendants' breaches were a proximate cause of damages to Plaintiffs and the Class.  In reasonable reliance on Defendants' advice regarding the Captive Insurance Strategies, Plaintiffs and the Class: (1) paid fees and premiums to the Defendants and Other Participants for insurance, tax, investment, financial, and legal advice; (2) did not avail themselves of legitimate tax savings opportunities; (3) filed federal tax returns that reflected deductions for premiums paid in connection with the Captive Insurance Strategies; and (4) spent substantial funds defending the IRS audits and in the Tax Court proceedings.  But for Defendants' breaches, Plaintiffs and the Class would not have hired Defendants and the Other Participants for advice on the Captive Insurance Strategies, engaged in the Captive Insurance Strategies, paid substantial fees and insurance premiums in connection with the Captive Insurance Strategies,  filed and signed federal and state tax returns that reflected deductions of premiums paid in connection with the Captive Insurance Strategies, failed to avail themselves of other legitimate tax savings opportunities, failed to file qualified amended returns, and/or spent substantial funds disputing the IRS audits and Tax Court challenges.

23
24
25
26
27

259.   As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

28

**COUNT VI**
**NEGLIGENCE/PROFESSIONAL MALPRACTICE**

260.    Plaintiffs repeat and reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

261.    As the insurance, tax, legal, financial and investment advisors for Plaintiffs and the members of the Class, Defendants owed Plaintiffs and the members of the Class a duty to comply with the applicable standards of care and the applicable provisions of their codes of professional responsibility.

262.    Defendants failed to meet those applicable standards of care.  Defendants' failure to meet the standard of care proximately caused damages to the Plaintiffs as set forth elsewhere in this Complaint.

263.    Defendants' failures to meet the applicable standards of care constitute negligence.

264.    The actions of all Defendants rise to the level of gross negligence. Accordingly, Plaintiffs and the members of the Class seek punitive/exemplary damages against the Defendants, jointly and severally.

265.    The Defendants' negligence/gross negligence was a proximate cause of the damages for Plaintiffs and members of the Class.  In reasonable reliance on Defendants' professional advice regarding the Captive Insurance Strategies, Plaintiffs and members of the Class: (1) paid fees and premiums to the Defendants and Other Participants for insurance, tax, investment, financial, and legal advice; (2) did not avail themselves of legitimate tax savings opportunities; and (3) filed federal tax returns that reflected deductions for premiums paid in connection with the Captive Insurance Strategy.  But for

114

Defendants' negligence/gross negligence, Plaintiffs and members of the Class would not have hired Defendants and the Other Participants for advice on the Captive Insurance Strategies, engaged in the Captive Insurance Strategies, paid substantial fees and insurance premiums in connection with the Captive Insurance Strategies,  filed and signed federal and state tax returns that reported deductions of premiums paid in connection with the Captive Insurance Strategies, failed to avail themselves of other legitimate tax savings opportunities, failed to file qualified amended returns, and/or spent substantial funds fighting the IRS audits and in Tax Court proceedings.

266.    As a result of the Defendants' negligent and grossly negligent acts and omissions, Plaintiffs and members of the Class incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

267.    Defendants' negligence/gross negligence proximately caused damages to Plaintiffs and members of the Class in that (1) they paid significant fees and premiums to the Defendants and Other Participants, (2) Plaintiffs and members of the Class owe substantial back-taxes, penalties, and/or interest, (3) Plaintiffs and members of the Class spent substantial funds fighting the IRS audits and in Tax Court challenges, (4) Plaintiffs and members of the Class lost the opportunity to avail themselves of other legitimate tax-savings opportunities, and (5) Plaintiffs and members of the Class have and will continue to incur substantial additional costs to rectify the situation.

268.    As a proximate cause of the foregoing, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $75,000.00

and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT VII
## NEGLIGENT MISREPRESENTATION

269.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

270.   During the course of their representation of Plaintiffs and members of the Class, Defendants each negligently made numerous affirmative representations, including those misrepresentations and omissions detailed in Count XI below, that were incorrect, improper, or false; negligently made numerous misleading omissions of material fact; and negligently gave numerous improper, inaccurate, and wrong recommendations, advice, instructions, and opinions to Plaintiffs and members of the Class.

271.   Defendants either knew or reasonably should have known that their representations, recommendations, advice and instructions were improper, inaccurate, or wrong.  Defendants either knew or reasonably should have known that their failures to disclose material information to Plaintiffs and members of the Class were improper and wrong and would mislead Plaintiffs and members of the Class.

272.   The Defendants' negligent and grossly negligent misrepresentations were a proximate cause of the damages of the Plaintiffs and members of the Class.  In reasonable reliance on Defendants' advice regarding the Captive Insurance Strategies, Plaintiffs and members of the Class: (1) paid substantial premiums and fees to the Defendants and Other Participants for insurance, tax, financial, investment, and legal advice; (2) did not avail themselves of legitimate tax savings opportunities; (3) filed federal tax returns that

reflected deductions for premiums paid in connection with the Captive Insurance Strategy; and (4) spent substantial funds defending the IRS audits and in the Tax Court proceedings.

273.    But for Defendants' negligent and grossly negligent misrepresentations and material omissions described above, Plaintiffs and members of the Class would not have hired Defendants and the Other Participants for advice on the Captive Insurance Strategies, engaged in the Captive Insurance Strategies, paid premiums to effectuate the Captive Insurance Strategies,  filed and signed federal and state tax returns that reported deductions of premiums paid in connection with the Captive Insurance Strategies, failed to avail themselves of other legitimate tax savings opportunities, and/or spent substantial funds fighting the IRS audits and in Tax Court challenges.

274.    As a result of the Defendants' negligent and grossly negligent misrepresentations and omissions, Plaintiffs and members of the Class incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

275.    The Defendants' conduct set forth herein proximately caused Plaintiffs and members of the Class to suffer injury in that Plaintiffs and members of the Class (1) paid significant premiums and fees to the Defendants and Other Participants, (2) owe substantial back-taxes, penalties, and/or interest, (3) lost the opportunity to avail themselves of other legitimate tax-savings opportunities, (4) spent substantial funds defending the IRS audits and in the Tax Court proceedings; and (5) Plaintiffs and members of the Class have and will continue to incur substantial additional costs to rectify the situation.

276.   As a proximate cause of the foregoing, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest and costs.

## COUNT VIII
## DISGORGEMENT

277.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

278.   As a result of Defendants' breach of their fiduciary duties, they should be required to disgorge all payments received by them from Plaintiffs and members of the Class or from any entity for work performed in connection with the Captive Insurance Strategies.

279.   Additionally, regardless of the merits of the insurance, tax, legal, financial and investment advice and services Defendants rendered to Plaintiffs and members of the Class, the fees the Defendants charged and which Plaintiffs and members of the Class paid are unlawful.

280.   Further, the Defendants did not disclose information that they were required to disclose—*i.e.,* the Defendants' pre-planned scheme; the Defendants conspired to design, market, sell, implement, and manage the Captive Insurance Strategies; the Defendants had a significant pecuniary interest in the Captive Insurance Strategies; and the Defendants' representation of Plaintiffs and members of the Class and their Arrangement with the other Defendants violated the applicable rules of professional

conduct.    Due to these failures to disclose and misconduct, the Defendants' fee agreements with Plaintiffs and members of the Class are not enforceable.

281.    Accordingly, the Defendants must disgorge their fees to Plaintiffs and members of the Class in an amount far in excess of $75,000.00.    In addition, Plaintiffs and members of the Class seek an award of attorneys' fees, interest, and costs.

**COUNT IX**
**RESCISSION**

282.    Plaintiffs and members of the Class reallege and incorporate each and every prior factual allegation set forth in the preceding paragraphs as if fully set forth herein.

283.    Plaintiffs and members of the Class and Defendants entered into several agreements in connection with the Captive Insurance Strategies (collectively "Agreements").    In deciding to enter into the Agreements, Plaintiffs and members of the Class relied on numerous material knowingly false affirmative representations and intentional omissions of material fact Defendants made to Plaintiffs and members of the Class.    Had Defendants not made those misrepresentations or omissions, Plaintiffs and members of the Class would not have entered into the Agreements.    Defendants made those misrepresentations and omissions with the intent that Plaintiffs and members of the Class would rely on them.    Plaintiffs and members of the Class are not in breach of any of their obligations pursuant to the Agreements.

284.    Further, as set forth above, the Agreements that Plaintiffs and members of the Class entered into with Defendants were procured by fraud, and Defendants fraudulently induced Plaintiffs and members of the Class to enter into these Agreements

in furtherance of the conspiracy between and among the Defendants and the Other Participants.

285.   Plaintiffs and members of the Class seek rescission of the Agreements.  In addition, Plaintiffs and members of the Class seek an award of attorneys' fees, interest, and costs.

**COUNT X**
**BREACH OF CONTRACT AND BREACH**
**OF THE DUTY OF GOOD FAITH AND FAIR DEALING**
**(IN THE ALTERNATIVE)**

286.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

287.   In the alternative to the fraud and rescission claims of Plaintiffs and members of the Class, Plaintiffs and members of the Class entered into the Agreements, which were valid and existing agreements with Defendants (collectively, the "Agreements").  These Agreements include the engagement agreements Plaintiffs and members of the Class signed with Clark and Clark & Gentry.  Those engagement agreements imposed upon Clark and Clark & Gentry numerous obligations[14] including, without limitation, the obligations of:

      a.   "handling of all domestic and foreign federal tax issues related to the formation" of Feedback;

      b.   "submitting all materials (other than tax returns) as required to the IRS";

---

[14] These obligations include not just what is explicitly stated in the Agreements but also pursuant to the duty of good faith and fair dealing implied by Arizona law in very contract, those matters within the parties' reasonable expectations, *i.e.*, implied promises essential to effectuate the contract's purposes

c. "all ongoing ordinary corporate and federal tax matters of" Feedback;

d. "preparation of all insurance license application papers for" Feedback;

e. "working with the insurance manager on creation of the Company business plan and design of insurance policies";

f. "overseeing the insurance manager with respect to regulatory compliance";

g. "hiring and overseeing professionals for premium analysis certification";

h. "acting as liaison to insurance consultant and insurance brokers, if any"; and

i. "reviewing tax returns prepared by the Company's accountant."

288.   Clark and Clark & Gentry breached each of these foregoing obligations, as well as others.  The entities Clark and Clark & Gentry formed and managed were not insurance companies because they did not provide *bona fide* insurance.  They therefore were not captive insurance companies nor in compliance with regulations.  The pooling arrangements that Clark and Clark & Gentry used to reinsure risk likewise failed to supply *bona fide* reinsurance.  The premiums were not determined pursuant to proper actuarial principles.  Accordingly, Clark and Clark & Gentry breached its agreement to form and arrange for professional management of the captive insurance company, handle all tax matters, review tax returns for accuracy, retain competent professionals to analyze

and certify premiums, and oversee regulatory compliance for the captive insurance company. To the extent they provided services, Clark and Clark & Gentry instead provided these services for non-insurance entities.

289.    In addition, Defendants, including Clark and Clark & Gentry, owed the Plaintiffs and members of the Class a duty of good faith and fair dealing under applicable law.  This contractual duty includes all promises which a reasonable person in the position of Plaintiffs and members of the Class would be justified in understanding were included and it prohibits Defendants from acting in a manner which would have the effect of destroying or injuring the right of Plaintiffs and members of the Class to receive the fruits of the agreements.  In this instance, that includes explicit and/or implicit promises that the Captive Insurance Strategies were legally formed and administered tax-advantaged captive insurance strategies, and that all tax returns and other governmental reports prepared with respect to those entities were prepared according to applicable legal and insurance principles.

290.    Plaintiffs and members of the Class were also third-party beneficiaries of agreements by, between, and among the Defendants and Other Participants, including, without limitation, agreements involving actuaries, accounting firms, and underwriters. These agreements included promises that the Defendants and the Other Participants would provide services in connection with forming, managing, calculating premiums for, analyzing risks for, calculating taxes for, and filing tax returns for captive insurance companies.  But the Defendants and the Other Participants failed to form actual captive insurance companies because they failed to ensure the Captive Insurance Strategies

provided insurance for insurable risks.  Thus, the Defendants and Other Participants, to the extent they provided services, provided services in connection with forming, managing, calculating premiums for, analyzing risks for, calculating taxes for, and filing tax returns for non-insurance entities.  This failure to supply insurance services breached agreements by, between, and among the Defendants and Other Participants to which Plaintiffs and members of the Class were third party beneficiaries.

291.   Based on the foregoing, Defendants breached their agreements with Plaintiffs and members of the Class, and their duty of good faith and fair dealing, by, among other things, structuring the Captive Insurance Strategies in a manner that violated applicable tax and insurance laws, improperly advising Plaintiffs that they could deduct the insurance premiums (as Defendants had calculated them) on their respective tax returns, and by failing to provide accurate, independent advice regarding the Captive Insurance Strategies.

292.   As shown above, Plaintiffs and members of the Class entered into oral and/or written contracts to provide Plaintiffs and members of the Class with competent, proper, and accurate insurance, legal, financial, investment, and tax advice and services and to design, develop, sell, implement and manage completely legal tax-advantaged Captive Insurance Strategies.  Defendants breached their oral and/or written contracts with the Plaintiffs and members of the Class.

293.   Plaintiffs and members of the Class fully performed their obligations under these contracts and thus did not contribute to Defendants' breaches in any way.

294.   As a result of Defendants' breaches of contract and breaches of the duty of good faith, Plaintiffs and members of the Class have suffered injury, in that (1) they paid significant premiums and fees to the Defendants and Other Participants, (2) they have paid or owe substantial back-taxes, penalties, and/or interest, (3) they lost the opportunity to avail themselves of other legitimate tax-savings and insurance opportunities, (4) they spent substantial funds defending the IRS audit and in Tax Court proceedings, and (5) they have incurred substantial additional costs to rectify the situation.

295.   As a proximate cause of the foregoing, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $75,000.00 per individual and should be awarded all actual, consequential, and incidental damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

**COUNT XI**
**FRAUD**

296.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

297.   In order to induce Plaintiffs and members of the Class to pay them substantial fees, Defendants directly—and indirectly—through the Other Participants— made numerous knowingly false affirmative misrepresentations and intentional omissions of material fact to Plaintiffs and members of the Class, including but not limited to:

      (1)      Orchestrating the design, development, implementation, operation, and management of the Captive Insurance Strategies;

      (2)      Advising Plaintiffs and the members of the Class to engage in the Captive Insurance Strategies;

(3)     Advising and recommending that Plaintiffs and members of the Class to engage in illegal and abusive tax shelters, the Captive Insurance Strategies;

(4)     Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies were illegal and abusive tax shelters;

(5)     Failing to disclose existing published authority that indicated that the purported tax of the Captive Insurance Strategies were improper and not allowable for federal income tax purposes;

(6)     Advising Plaintiffs and members of the Class that the Captive Insurance Strategies the Defendants and the Other Participants advised Plaintiffs and members of the Class to execute complied with the applicable tax and insurance laws, rules, regulations, common law doctrines, and published court decisions;

(7)     Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies the Defendants and the Other Participants advised Plaintiffs and members of the Class to execute did not comply with the applicable tax and insurance laws, rules, regulations, common law doctrines, and published court decisions;

(8)     Failing to advise Plaintiffs and members of the Class that various common law doctrines, including the economic substance, business purpose, step transaction, and sham transaction doctrines, would disallow the tax benefits of the Captive Insurance Strategies;

(9)     Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies lacked the required business purpose and economic substance;

(10)    Advising Plaintiffs and the members of the Class that the policies issued by their Captive Insurance Strategies constituted insurance and therefore created lawful tax benefits for the Captive Insurance Company and the insured;

(11)    Recommending, instructing, and advising Plaintiffs and members of the Class that they would receive substantial tax advantages by entering into policies with the captive insurer as part of the Captive Insurance Strategies;

125

(12)      Advising Plaintiffs and members of the Class that the Captive Insurance Companies complied with Section 831(b) of the Internal Revenue Code and therefore the premiums paid to the captive insurance companies would be tax deductible;

(13)      Failing to advise Plaintiffs and members of the Class that the Captive Insurance Companies did not comply with Section 831(b) of the Internal Revenue Code and therefore the premiums paid to the captive insurance companies would not be tax deductible;

(14)      Advising Plaintiffs and members of the Class that the captive insurance companies comply with Section 831(b) of the Internal Revenue Code and therefore the Captive Insurance Company would not pay taxes on the premiums received;

(15)      Failing to advise Plaintiffs and members of the Class that the captive insurance companies would not comply with Section 831(b) of the Internal Revenue Code and therefore the Captive Insurance Company would pay taxes on the premiums received;

(16)      Advising Plaintiffs and members of the Class that the captive insurance companies that Defendants formed, operated, and managed in connection with the Captive Insurance Strategies would be operated as normal insurance companies;

(17)      Failing to advise Plaintiffs and members of the Class that the captive insurance companies that Defendants formed, operated, and merged and in connection with the Captive Insurance Strategies would not be operated as normal insurance companies;

(18)      Advising Plaintiffs and members of the Class that the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies would fall within a safe harbor provision of Section 831(b) of the Internal Revenue Code;

(19)      Failing to advise Plaintiffs and members of the Class that the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies would not fall within any safe harbor provision of Section 831(b) of the Internal Revenue Code;

(20)    Advising Plaintiffs and members of the Class that the Captive Insurance Strategies involved the purchase of *bona fide* insurance;

(21)    Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies did not involve the purchase of *bona fide* insurance;

(22)    Advising Plaintiffs and the members of the Class that the Captive Insurance Strategies provided insurance coverages that were highly rated by the insurance industry;

(23)    Failing to advise Plaintiffs and the members of the Class that the Captive Insurance Strategies provided insurance coverages that were not highly rated by the insurance industry;

(24)    Advising Plaintiffs and members of the Class that the Captive Insurance Strategies covered gaps in commercial coverage for material risks facing Captive Insurance Strategy clients;

(25)    Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies did not cover gaps in commercial coverage for material risks facing Captive Insurance Strategy clients;

(26)    Failing to advise Plaintiffs and members of the Class that the insurance policies used to implement the Captive Insurance Strategies were significantly overpriced;

(27)    Advising, instructing, and assisting Plaintiffs and members of the Class in the purchase and execution of the captive insurance policies;

(28)    Advising Plaintiffs and members of the Class that the risks covered by the Captive Insurance Strategies were insurable risks;

(29)    Failing to advise Plaintiffs and members of the Class that the risks covered by the Captive Insurance Strategies were not insurable risks;

(30)    Advising Plaintiffs and members of the Class that the premium prices of the captive insurance companies were calculated through actuarially sound methods;

(31)   Failing to advise Plaintiffs and members of the Class that their premiums for the insurance policies were not in fact arrived at by actuarially sound calculations;

(32)   Advising Plaintiffs and members of the Class that the pooling arrangements of the Captive Insurance Strategies through Pan American complied with all risk shifting and risk distribution requirements;

(33)   Failing to advise Plaintiffs and members of the Class that the pooling arrangements of the Captive Insurance Strategies through Pan American did not comply with all risk shifting and risk distribution requirements;

(34)   Advising Plaintiffs and members of the Class that loans and distributions from the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies were proper, legal, and complied with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(35)   Failing to advise Plaintiffs and members of the Class that loans and distributions from the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies were not proper and did not comply with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(36)   Advising Plaintiffs and members of the Class that circular cash flows between the insured and the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies were proper and complied with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(37)   Failing to advise Plaintiffs and members of the Class that circular cash flows between the insured and the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies were not proper and did not comply with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(38)   Advising Plaintiffs and the members of the Class to sign and file tax returns that reported the tax deductions and benefits of

the Captive Insurance Strategy in reliance on Defendants' advice, representations, recommendations, instructions, and opinions, which Defendants knew or should have known the IRS and a tax court would disallow as improper and illegal;

(39)   Advising, instructing, and assisting in the preparation of the tax return for Plaintiffs and members of the Class, which reported the premiums, fees, and expenses generated in connection with the Captive Insurance Strategies as deductions of income;

(40)   Failing to advise Plaintiffs and members of the Class not to report the premiums, fees, and expenses generated in connection with the Captive Insurance Strategies as deductions on the tax returns of Plaintiffs and members of the Class;

(41)   Advising Plaintiffs and members of the Class that their tax returns, which utilized the reduction in taxes generated by the Captive Insurance Strategies, were prepared pursuant to and/or complied with IRS guidelines and established legal authorities;

(42)   Failing to advise Plaintiffs and members of the Class that their tax returns, which utilized the reduction in taxes generated by the Captive Insurance Strategies, were not prepared pursuant to and/or did not comply with IRS guidelines and established legal authorities;

(43)   Failing to disclose to Plaintiffs and members of the Class that if they filed tax returns that deducted the premiums, fees, and expenses of the Captive Insurance Strategies they would be liable for taxes, penalties and/or interest if audited;

(44)   Preparing the tax returns for the captive insurance companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies that reported the tax benefits related to the premiums received and advising Plaintiffs and members of the Class to sign, file, and rely upon these tax returns;

(45)   Advising Plaintiffs and members of the Class to report the premiums, fees, and expenses of the Captive Insurance Strategies as deductions on their tax returns;

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(46)      Advising Plaintiffs and members of the Class that the Captive Insurance Strategies would be upheld as a legal micro-captive insurance company if audited;

(47)      Failing to Advise Plaintiffs and members of the Class that the Captive Insurance Strategies would not be upheld as a legal micro-captive insurance strategy if audited;

(48)      Advising Plaintiffs and members of the Class that the tax benefits of the Captive Insurance Strategies would be allowed if audited;

(49)      Failing to advise Plaintiffs and members of the Class that the tax benefits of the Captive Insurance Strategies would be disallowed if audited;

(50)      Advising Plaintiffs and members of the Class, both before and after the IRS audit, that the Captive Insurance Strategies they executed were different and distinguishable from other Captive Insurance Strategies that the IRS and/or Tax Court had disallowed;

(51)      Failing to advise Plaintiffs and members of the Class, both before and after the IRS audit, that the Captive Insurance Strategies they executed were not different and distinguishable from other Captive Insurance Strategies that the IRS and/or Tax Court had disallowed;

(52)      Advising Plaintiffs and members of the Class that they should challenge the IRS in both audits and Tax Court proceedings because Plaintiffs and members of the Class would prevail and the Captive Insurance Strategies would be allowed;

(53)      Failing to advise Plaintiffs and members of the Class that they should not challenge the IRS in both audit and Tax Court proceedings because Plaintiffs and members of the Class would not prevail and the Captive Insurance Strategies would be disallowed;

(54)      Advising Plaintiffs and members of the Class that the management of the investments of each individual captive insurance company would comply with the tax code and prevailing insurance industry standards;

(55)      Failing to advise Plaintiffs and members of the Class that the management of the investments of each individual captive

130

insurance company would not comply with the tax code and prevailing insurance industry standards;

(56)    Making and endorsing the statements and representations contained in the Defendants' and the Other Participants' oral and written advice, instructions, and recommendations;

(57)    Failing to advise Plaintiffs and members of the Class that each of the Defendants and the Other Participants were not "independent" of one another and in fact were involved in a conspiracy to design, market, sell, and implement the Captive Insurance Strategies; and

(58)    Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Plaintiffs and members of the Class, orally or in writing, regarding the propriety of the Captive Insurance Strategies.

298.    The above affirmative misrepresentations and/or intentional omissions of material fact made by each Defendant were false when made, and the Defendants knew these representations to be false when made with the intention that Plaintiffs and members of the Class rely upon them in entering into the Captive Insurance Strategies and pay them substantial fees. In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were committed knowingly by the Defendants with the intent to induce Plaintiffs and members of the Class to enter into the Captive Insurance Strategies and pay Defendants substantial fees.

299.    In reasonable reliance on the Defendants' false affirmative misrepresentations and intentional omissions of material facts regarding the Captive Insurance Strategies, Plaintiffs and members of the Class paid substantial fees to Defendants, paid additional amounts to execute the Captive Insurance Strategies, unnecessarily paid premiums to effectuate the Captive Insurance Strategies, filed tax

returns that reflected improper tax treatment resulting from the Captive Insurance Strategies, did not disclose the Captive Insurance Strategies on their tax returns as tax shelters, and spent substantial funds defending the IRS audits and in Tax Court proceedings.

300.   But for Defendants' intentional misrepresentations and material omissions described above, Plaintiffs and members of the Class would not have hired Defendants and the Other Participants for advice on the Captive Insurance Strategies, engaged in the Captive Insurance Strategies, paid premiums in connection with the Captive Insurance Strategies, signed federal and state tax returns that reported deductions of premiums paid in connection with the Captive Insurance Strategies,  failed to avail themselves of other legitimate tax savings opportunities, and spent substantial funds fighting the IRS audits and in Tax Court challenges.

301.   As a result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that (1) they paid significant fees and premiums to the Defendants and Other Participants, (2) they owe substantial back-taxes, penalties, and/or interest, (3) they lost the opportunity to avail themselves of other legitimate tax-savings opportunities, (4) they spent substantial funds to defend the IRS audits and in Tax Court proceedings; and (5) they incurred substantial additional costs to rectify the situation.

302.   As a proximate cause of the foregoing injuries, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

**COUNT XII**
**AIDING AND ABETTING**

303.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

304.   As described more fully throughout this Complaint, each of the Defendants aided and abetted the wrongful conduct (including fraud and breaches of fiduciary duty) of each of the other Defendants.  Each Defendant was aware of its respective role and responsibility in the overall tortious activity and intentionally provided aid and substantial assistance in the other Defendants' tortious activity.

305.   As a proximate cause of Defendants' conduct set forth herein, Plaintiffs have suffered injury and damages.

306.   Plaintiffs have been injured in an actual amount to be proven at trial, but in excess of $75,000.00, and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

**COUNT XIII**
**CIVIL CONSPIRACY**

307.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

308.   As described more fully above, the Defendants and the Other Participants knowingly acted in concert to design, market, sell, implement, and manage tax-advantaged captive insurance strategies that were fraudulent, illegal and abusive tax shelters—the Captive Insurance Strategies.   In furtherance of their conspiracy, the Defendants and the Other Participants conspired to perpetrate fraud on the Plaintiffs and

members of the Class.  In doing so, the Defendants and the Other Participants acted with full knowledge and awareness that the transactions were designed to give the false impression that a complex series of financial transactions were legitimate business transactions that had economic substance from an investment standpoint and complied with all applicable insurance and tax laws, when the transactions in fact lacked those features (which were necessary for a successful Captive Insurance Strategy).

309.   The Defendants and the Other Participants acted in the respective roles as described above according to a predetermined and commonly understood and accepted plan of action to perpetrate fraud on Plaintiffs (*i.e.*, the Defendants' Arrangement), all for the purposes of obtaining fees from consumers, including the Plaintiffs and members of the Class.   The Defendants and the Other Participants authorized, ratified, and/or affirmed the fraudulent misrepresentations and omissions of material fact that each Defendant and/or Other Participant made to Plaintiffs and members of the Class.

310.   The acts of the Defendants and the Other Participants were contrary to numerous provisions of law, as stated above, and constitute a conspiracy to perpetrate fraud on Plaintiffs and members of the Class.

311.   There was a meeting of the minds between and among the Defendants and the Other Participants to commit the unlawful acts alleged herein, including a conspiracy to perpetrate fraud on Plaintiffs and members of the Class.  The conspiracy to commit these unlawful and fraudulent acts proximately caused and continue to cause damages to Plaintiffs and members of the Class as previously set forth herein.

312.   As a result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that (1) they paid significant fees and premiums to the Defendants and Other Participants, (2) they owe substantial back-taxes, penalties, and/or interest, (3) they lost the opportunity to avail themselves of other legitimate tax-savings opportunities, (4) they spent substantial funds defending the IRS audits and in Tax Court proceedings, and (5) Plaintiffs and members of the Class have and will continue to incur substantial additional costs to rectify the situation.

313.   Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## XI.   PRAYER FOR RELIEF

314.   Based upon the foregoing, Plaintiffs request that Defendants be cited to appear and answer; that the requested class be certified for trial and/or settlement; and that on final hearing Plaintiffs and the members of the Class have judgment against Defendants, jointly and severally for:

a.   actual, consequential, and incidental damages;

b.   rescission and disgorgement;

c.   pre- and post-judgment interest at the highest legal rate allowed by law;

d.   all attorneys' fees and costs in pursuing this matter;

e.   punitive and treble damages in an amount to be determined at trial; and

f.   such other and further relief, both at law and in equity, to which Plaintiffs and the Class may show themselves to be justly entitled.

Dated:  July 3, 2019                    Respectfully submitted,

*/s/ Garrett W. Wotkyns*
Garrett W. Wotkyns, AZ Bar No. 025887
**SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP**
8501 North Scottsdale Road, Suite 270
Scottsdale, Arizona  85253
Telephone: (480) 428-0142
Facsimile: (866) 505-8036
gwotkyns@schneiderwallace.com

*/s/ David R. Deary*
David R. Deary*
W. Ralph Canada, Jr.*
Jim L. Flegle*
Wilson E. Wray*
John McKenzie*
Donna Lee*
Tyler M. Simpson*
**LOEWINSOHN FLEGLE DEARY SIMON LLP**
12377 Merit Drive, Suite 900
Dallas, Texas 75251
(214) 572-1700 Telephone
(214) 572-1717 Facsimile
davidd@lfdslaw.com
ralphc@lfdslaw.com
jimf@lfdslaw.com
wilsonw@ lfdslaw.com
johnm@ lfdslaw.com
donnal@ lfdslaw.com
tylers@ lfdslaw.com

*Attorneys for Plaintiffs*

*(Pro Hac Vice)*

136

### CERTIFICATION PURSUANT TO A.R.S. § 12-2602

Pursuant to A.R.S. § 12-2602,[15] Plaintiffs hereby certify in writing that expert opinion testimony is or may be necessary to prove the standard of care and/or liability of the following persons and claims[16] asserted in Plaintiffs' Class Action Complaint:

Count V, Breach of Fiduciary Duty as to Defendant John Garcia, in his capacity as personal representative for the Estate of Craig McEntee, and Defendant Neil Hiller.

Count VI, Negligence/Professional Malpractice, as to Defendant John Garcia, in his capacity as personal representative for the Estate of Craig McEntee, and Defendant Neil Hiller.

Count VII, Negligent Misrepresentation, as to Defendant John Garcia, in his capacity as personal representative for the Estate of Craig McEntee, and Defendant Neil Hiller.

Count X, Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing, as to Defendant John Garcia, in his capacity as personal representative for the Estate of Craig McEntee, and Defendant Neil Hiller.

Plaintiffs anticipate that they will offer expert testimony regarding the acts/omissions of some or all of the other Defendants. Upon information and belief, none of these other Defendants are "licensed professionals" in Arizona for whom certification is required pursuant to A.R.S. §§ 12-2601 and 12-2602.

---

[15] Plaintiffs make this certification in an abundance of caution and without prejudice to their position that A.R.S. § 12-2602 is inapplicable to an action in federal court pursuant to the *Erie* Doctrine. Plaintiffs further reserve the right to supplement or withdraw their certifications as may be allowed pursuant to law or by order of the Court.

[16] As to those persons and claims not listed herein, certification is not required by A.R.S. § 12-2602 and/or due to Federal preemption.

137

1

2

*/s/ Garrett W. Wotkyns*

Garrett W. Wotkyns, AZ Bar No. 025887

3   **SCHNEIDER WALLACE COTTRELL**
   **KONECKY WOTKYNS LLP**

4   8501 North Scottsdale Road, Suite 270

5   Scottsdale, Arizona  85253
   Telephone: (480) 428-0142

6   Facsimile: (866) 505-8036
   gwotkyns@schneiderwallace.com

7

8   */s/ David R. Deary*

   David R. Deary*

9   W. Ralph Canada, Jr.*

   Jim L. Flegle*

10   Wilson E. Wray*

11   John McKenzie*

   Donna Lee*

12   Tyler M. Simpson*

13   **LOEWINSOHN FLEGLE**
   **DEARY SIMON LLP**

14   12377 Merit Drive, Suite 900

15   Dallas, Texas 75251
   (214) 572-1700 Telephone

16   (214) 572-1717 Facsimile

   davidd@lfdslaw.com

17   ralphc@lfdslaw.com

18   jimf@lfdslaw.com
   wilsonw@lfdslaw.com

19   johnm@lfdslaw.com

20   donnal@lfdslaw.com
   tylers@lfdslaw.com

21

   *Attorneys for Plaintiffs*

22

23   *(Pro Hac Vice)*

24

25

26

27

28